The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

MIDVALE COMMONS, LLC

**DEFENDANTS**

CONSTRUCTION LOAN SERVICES II, LLC D/B/A OR A/KA BUILDERS CAPITAL

**(b)** County of Residence of First Listed Plaintiff    Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Pierce
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Silverang, Rosenzweig & Haltzman, LLC/900 E. 8th Ave., Suite 300, King of Prussia, PA 19406/ 610-263-0115

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1962, et seq.
Brief description of cause:
Civil Action Arising Under 18 U.S.C. § 1962, et seq. (Racketeer Influenced and Corrupt Organizations (RICO) Act)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
excess of $50,000,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 01/09/2026 | /s/ Philip S. Rosenzweig |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.** **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.** **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: ___Philadelphia, PA_____

---

*RELATED CASE IF ANY:*   Case Number:_____ Judge:_____

1. Does this case involve property included in an earlier numbered suit?     Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?     Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?     Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?     Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation.     Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☑ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

*A.*  *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Wage and Hour Class Action/Collective Action
☐ 6. Patent
☐ 7. Copyright/Trademark
☐ 8. Employment
☐ 9. Labor-Management Relations
☐ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☐ 15. Cases Seeking Systemic Relief *see certification below*
☑ 16. All Other Federal Question Cases. *(Please specify):*Rackateer Influenced and Corrupt Organizations (RICO) Act

*B.*  *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):*_____
☐ 7. Products Liability
☐ 8. All Other Diversity Cases: *(Please specify)*_____
_____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☑ **does not** have implications beyond the parties before the court and ☐ **does** / ☑ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☑   Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐   None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

**MIDVALE COMMONS, LLC**
6610 GERMANTOWN AVENUE
PHILADELPHIA, PA 19119

**TROLLEY CAR DEVELOPMENT, L.P.**
1300 BETHLEHEM PIKE
FLOURTOWN, PA 19031

**INDIANA HEIGHTS, LLC**
482 NORRISTOWN ROAD
BLUE BELL, PA 19422

-AND-

**PLYMOUTH SQUARE ASSOCIATES I**
482 NORRISTOWN ROAD
BLUE BELL, PA 19422

PLAINTIFFS,

**v.**

**CONSTRUCTION LOAN
SERVICES II, LLC D/B/A OR A/K/A
BUILDERS CAPITAL**
1019 39TH AVE. SE, SUITE 220
PUYALLUP, WA 98374

**VALERIE MOSES**
1019 39TH AVE. SE, SUITE 220
PUYALLUP, WA 98374

**BILL FINZER**
1019 39TH AVE. SE, SUITE 220
PUYALLUP, WA 98374

**LYNDA RODRIGUEZ**
1019 39TH AVE. SE, SUITE 220
PUYALLUP, WA 98374

**DAVID SCHULTZ**
1019 39TH AVE. SE, SUITE 220
PUYALLUP, WA 98374

**MICHELE HOWE**
1019 39TH AVE. SE, SUITE 220
PUYALLUP, WA 98374

**CURT ALTIG**
1019 39TH AVE. SE, SUITE 220
PUYALLUP, WA 98374

**Civil Action Arising Under
18 U.S.C. § 1962, *et seq.***
(Racketeer Influenced and Corrupt
Organizations (RICO) Act)

**CASE NO.** _____

---

**SALUDA GRADE HOLDINGS, LLC**
5 BRYANT PARK, FLOOR 23
NEW YORK, NY 10018

-*AND*-

**SALUDA GRADE ASSET
MANAGEMENT, LLC**
5 BRYANT PARK, FLOOR 23
NEW YORK, NY 10018

*DEFENDANTS.*

# COMPLAINT

Plaintiffs, Midvale Commons LLC ("**Midvale**"), Trolley Car Development L.P. ("**Trolley Car**"), Plymouth Square Associates I and Indiana Heights, LLC (together with Plymouth Square Associates I, "**Indiana Heights**"), by and through their undersigned counsel, Silverang, Rosenzweig & Haltzman LLC, bring the instant Complaint (this "**Complaint**") against the above-captioned Defendants for the loss of millions of dollars of damages suffered as a result of a fraudulent lending scheme perpetrated by Defendants relative to various construction projects and loans described in greater detail herein. In support thereof, Plaintiffs[1] collectively aver as below:

## INTRODUCTION

1.      The instant action, brought pursuant to 18 U.S.C. § 1962, *et seq.,* arises from a scheme perpetrated by Defendants Saluda Grade Holdings, LLC ("**Saluda Holdings**") and Saluda Grade Asset Management, LLC ("**Saluda Management**" or, together with Saluda Holdings, "**Saluda Grade**"), as well as Defendant Construction Loan Services II, LLC d/b/a or a/k/a Builders Capital ("**Loan Services**" or "**Lender**"), in concert with other Defendants.

2.      These Defendants fraudulently induced Plaintiffs to enter into construction financing agreements by materially misrepresenting loan terms, with promises of prompt funding

---

[1] Midvale, Trolley Car, and Indiana Heights are collectively the "**Plaintiffs**."

of construction draws and maturity extensions that would not carry interest increases or other penalties.

3.      Defendants willfully failed and refused to honor these obligations, and, instead, demanded that Plaintiffs agree to material modifications of the loans during the stage of the construction projects when Plaintiffs were most vulnerable.

4.      Saluda Grade, Loan Services and the various individual Defendants operate collectively as an associated-in-fact "enterprise" under the Racketeer Influenced and Corrupt Organizations (RICO) Act (the "**Enterprise**"). *See* 18 U.S.C. §§ 1962(c)-(d).

5.      The Enterprise was formed for the purpose of executing a systematic "loan-to-own" scheme designed to generate profit *not* through successful construction project completion (as defendants knowingly misrepresented), but rather through fraud, economic extortion, and eventual foreclosure on distressed collateral.

6.      The Enterprise is characterized by an ongoing, coordinated effort through which Loan Services, as the originating and servicing lender, offers favorable loan terms to potential borrowers such as Plaintiffs herein.

7.      As part of the Enterprise, Loan Services misrepresents itself and its capital partner, Saluda Grade, to be capable of promptly funding draw requests and granting penalty-free extensions as a material inducement to Plaintiffs to enter into lending agreements with Loan Services.

8.      Upon information and belief, as further part of the Enterprise, once the lending agreement is solidified, Loan Services structures the financing to satisfy Saluda Grade's specific securitization requirements, without regard to the borrower's financing needs or the needs of the subject construction project.

9. The Enterprise involves a common pattern and practice conducted by certain of Loan Services' personnel, including Defendants Valerie Moses, Bill Finzer, Lynda Rodriguez, David Schultz, Michele Howe and Curt Altig (collectively, the "**Individual Defendants**") of repeatedly failing to fund draw requests, both through the improper refusal to approve requests and the delay of approved wires.

10. The Individual Defendants engaged in these acts with respect to funding for multiple Philadelphia-based construction projects located at 3417 W. Indiana Avenue (the "**Indiana Heights Project**"), 3503 Midvale Avenue (the "**Midvale Project**"), and 7611-17 Germantown Avenue (the "**Germantown Project**", or, together with the Indiana Heights Project and the Midvale Project, collectively the "**Projects**") owned and controlled by Plaintiffs.

11. Further with respect to each of the Projects, Loan Services leveraged the economic duress of the significant ongoing interest payments it imposed upon the Plaintiffs to extort concessions from Plaintiffs in exchange for loan extensions, in violation of the controlling loan documents. These concessions include exorbitant fees and punitive interest rate increases.

12. As the construction lender for the Projects, Loan Services was, at the time it wrongfully obtained these concessions, aware of: (1) the principal outstanding relative to each loan; (2) the monthly interest charges paid by each Plaintiff relative to such principal; and (3) the critical importance to Plaintiffs of avoiding a maturity default.

13. Based on this knowledge, Loan Services offered a "loan extension option" to Plaintiffs which was entirely illusory. The Plaintiffs therefore faced a Hobson's choice: accept the exorbitant modification terms offered by Defendants or litigate the validity of a maturity default, all while accruing significant interest charges.

14.     Upon information and belief, the conduct of Defendants relative to the Projects (and attendant loans) discussed herein is part of a Defendants' longstanding, widespread pattern and practice of manufacturing defaults relative to the construction projects they fund, in order to later foreclose on substantially completed projects, extracting extreme value for pennies on the dollar.

## PARTIES

1.     Plaintiff Midvale Commons, LLC is a limited liability company organized pursuant to the laws of the Commonwealth of Pennsylvania with an address of 1300 E. Mermaid Lane, Suite A, Wyndmoor, Pennsylvania 19038.

2.     Plaintiff Trolley Car Development, L.P. is a limited partnership organized pursuant to the laws of the Commonwealth of Pennsylvania with an address of 1300 Bethlehem Pike, Suite 21, Flourtown, Pennsylvania 19031.

3.     Plaintiff Indiana Heights, LLC is a limited liability company organized pursuant to the laws of the Commonwealth of Pennsylvania with an address of 1300 E. Mermaid Lane, Suite A, Wyndmoor, Pennsylvania 19038.

4.     Plaintiff Plymouth Square Associates I is a limited partnership organized pursuant to the laws of the Commonwealth of Pennsylvania with an address of 300 Welsh Road, Building 1, Suite 100, Horsham, Pennsylvania 19044.

5.     Defendant Construction Loan Services II, LLC d/b/a or a/k/a Loan Services is a limited liability company organized pursuant to the laws of the State of Washington with an address of 1019 39th Avenue, Suite 220, Puyallup, Washington 98374.

6.     Defendant Valerie Moses is, upon information and belief, an adult individual in the employ of Loan Services with an address of 1019 39th Avenue, Suite 220, Puyallup, Washington 98374.

7.      Defendant Bill Finzer is, upon information and belief, an adult individual in the employ of Loan Services with an address of 1019 39th Avenue, Suite 220, Puyallup, Washington 98374.

8.      Defendant Lynda Rodriguez is, upon information and belief, an adult individual in the employ of Loan Services with an address of 1019 39th Avenue, Suite 220, Puyallup, Washington 98374.

9.      Defendant David Schultz is, upon information and belief, an adult individual in the employ of Loan Services with an address of 1019 39th Avenue, Suite 220, Puyallup, Washington 98374.

10.      Defendant Michele Howe is, upon information and belief, an adult individual in the employ of Loan Services with an address of 1019 39th Avenue, Suite 220, Puyallup, Washington 98374.

11.      Defendant Curt Altig is, upon information and belief, an adult individual in the employ of Loan Services with an address of 1019 39th Avenue, Suite 220, Puyallup, Washington 98374.

12.      Defendant Saluda Grade Holdings, LLC is a limited liability company organized pursuant to the laws of the State of Delaware and having an address of 5 Bryant Park, Floor 23, New York, New York 10018.

13.      Defendant Saluda Grade Asset Management, LLC is a limited liability company organized pursuant to the laws of the State of Delaware and having an address of 5 Bryant Park, Floor 23, New York, New York 10018.

## JURISDICTION AND VENUE

14.    This Court has subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. § 1331, insofar as Plaintiffs assert claims under 18 U.S.C. §§ 1961-1968.

15.    This Court has supplemental subject matter jurisdiction over the instant action pursuant to 28 U.S.C. § 1367(a), insofar as any claims asserted herein not arising within the Court's original jurisdiction "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution" *and* the carve-out provided by 28 U.S.C. § 1367(c) is inapplicable. 28 U.S.C. § 1367; *accord Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)("[C]onsiderations [of judicial economy, convenience, and fairness to the parties[] will normally counsel an exercise of district court jurisdiction over state claims based on the same nucleus of operative facts unless the district court can point to some substantial countervailing consideration.").

16.    Personal jurisdiction over the Defendants is appropriate pursuant to Federal Rule of Civil Procedure 4(k) which grants this Court jurisdictional authority identical to that of the Pennsylvania Court of Common Pleas, which, pursuant to the Pennsylvania long-arm statute, can be exercised to the maximum extent allowed by the United States Constitution. *See* 42 Pa.C.S. § 5322(b).

17.    As alleged *infra*, each of the Defendants has the requisite "minimum contacts" with the Commonwealth of Pennsylvania insofar as (1) each does business with Pennsylvania businesses and (2) the disputes herein arose in Pennsylvania, such that the requirements of due process are satisfied and exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Control Screening, LLC v. Technological Application and*

*Production Co. (Tecapro), HCMC-Vietnam*, 687 F.3d 163, 167 (3d Cir. 2012) (quoting *Int'l Shoe*

*Co. v. Washington*, 326 U.S. 310, 316 (1945)).

18.     Venue within the United States District Court for the Eastern District of

Pennsylvania is proper pursuant to 28 U.S.C. § 1391(b)(2), as this is the "judicial district in which

a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part

of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). The acts

complained of herein arose in this District and the Projects are located in this District.

## FACTS

### A. General Background

19.     Defendant Loan Services markets itself as "America's Premier Private

Construction Lender."[2]

20.     Defendant Saluda Grade markets itself as a private alternative real estate advisory

and asset management firm, also known as a warehouse lender.[3]

21.     Defendant Construction Loan Services II, LLC operates under the trade name

"Loan Services."

22.     In or around late 2021, Plaintiffs began communicating, both directly and through

their broker, non-party Josh Dormody, with various representatives of Loan Services, including

Blake Rodgers, regarding the origination of multiple multi-family construction loans supported by

a tranche of capital raised by Saluda Grade.

23.     Loan Services, pursuant to various loan facilities, committed to provide

construction funding for the Projects as follows:

     a.     Loan No. 72683 (the "**Germantown Loan**") for the Germantown Project,

---

[2] https://www.builderscapital.com (last accessed November 24, 2025).
[3] https://www.saludagrade.com (last accessed November 24, 2025).

    b.   Loans 72759 (the "**First Indiana Heights Loan**") and 72798 (the "**Second Indiana Heights Loans**" or, together with the First Indiana Heights Loan, the "**Indiana Heights Loans**") for the Indiana Heights Project, and

    c.   Loan No. 72629 (the "**Midvale Loan**" or, collectively with the Germantown Loan and the Indiana Heights Loan, the "**Loans**") for the Midvale Project.

24.    Loan Services utilized various personnel in the underwriting, servicing and management of these loans, including Valerie Moses (Vice President of Servicing & Special Assets), Bill Finzer (Special Assets officer), Lynda Rodriguez (Special Asset officer), David Schultz (Special Assets officer), Michele Howe (Special Assets officer), Curt Altig (Chairman & Founder), Katherine Butler (Transaction Coordinate), Mark Woodbridge (Chief Sales Officer), and Robert Trent (Chief Executive Officer).

25.    The Loans were ultimately governed by various loan documents, including Loan Agreements, Promissory Notes, Mortgages (and other security instruments), Carveout Guaranties, Completion and Performance Guaranties, and Assignments and Indemnity Agreements (collectively referred to in the case of each of the Loans as the "**Loan Documents**"). True and correct copies of the Loan Documents for each of the Germantown Loan, the First Indiana Heights Loan, the Second Indiana Heights Loan, and the Midvale Loan, are collectively attached hereto as **Exhibits 1, 2, 3 and 4**, respectively.

26.    The Loans were subject to an extensive underwriting process through which each of the Plaintiffs negotiated the terms of the Loans with Loan Services, and which terms Loan Services was then required to confirm with Saluda Grade.

27.    During the course of underwriting the Loans, the Plaintiffs *repeatedly* requested that Loan Services confirm that the terms and structure offered pursuant to Loan Services' letters

of intent were acceptable to Saluda Grade, because Saluda Grade was the source of capital flowing through Loan Services to each Plaintiff.

28.     Upon presenting the terms to which Loan Services committed in various letters of intent, Saluda Grade requested modifications to the structure of each of the Loans (as more fully detailed in the discussion of each Project, *infra*).

29.     Upon information and belief, specific modifications were made to the terms of the Loans to satisfy Saluda Grade prior to the execution of each set of Loan Documents.

30.     The Loan Documents expressly provided that each of the Plaintiffs was entitled to no-fee extensions of the loan term, without interest rate increases. *See* <u>Ex. 1-4</u> at Promissory Note, § 7.7 (Providing for an extension at the interest rate "[e]ffective as of the originally scheduled Maturity Date, the Note Rate for the Loan shall increase with any such extension to a rate **<u>per annum</u> <u>equal to 0.00%</u>** above the original Note Rate[.]" (emphasis added)).

31.     The Loan Documents also expressly provided that no extension fee would be required for the first extension of maturity with respect to each Project, with extensions thereafter incurring a fee of 1.00%. *See id.* at Promissory Note, § 7.6 ("Borrower pays Lender […] an extension fee equal to 1.00% of the Committed Loan Amount […] **<u>provided that, no extension fee shall be due or payable in connection with the first extension period exercised hereunder</u>**." (emphasis added)).

32.     Following closing and initial funding of each of the Loans, and for approximately twelve to eighteen months thereafter, Plaintiffs were able to draw down the Loans as expected; Loan Services generally funded each draw-request made by the Plaintiffs, pursuant to the terms of the respective Loan Documents.

33.    Draw requests were submitted in accordance with the following provision of the

Loan Documents:

> Borrower shall make periodic requests for draws under the Loan at such frequency as Lender, in its sole discretion, may allow [...] by providing Lender with all necessary Draw Affidavits, accompanied by all information, authorizations, and documents as Lender may request. Lender will disburse the requested Draw directly to Borrower, unless Lender and Borrower have mutually agreed upon some other disbursement method once Lender is satisfied, based on its own inspections and other reliable information, that (i) the development of the Project is progressing satisfactorily and in conformance with all applicable Laws and other requirements; (ii) all other conditions to Draws set forth in this Agreement have been satisfied, including each of the conditions set forth in the foregoing section [(concerning authority to enter into the Loan Documents)], (iii) all funds that are to be contributed or obtained from parties other than Lender and Borrower have been funded as is provided for in the Budget; (iv) all representations and warranties contained herein or in any of the other applicable Loan Documents remain true and correct; (v) Borrower remains in full compliance with all terms, conditions and covenants herein and in any of the applicable Loan Documents; and (vi) any guarantees required by Lender are in effect.

*Id.* at Promissory Note, § 5.1.

34.    Each of the Plaintiffs generally submitted draw requests to Loan Services in the

form required by Loan Services.

35.    Upon submission of the draw request, Loan Services would schedule an inspection

of the Project's worksite , and receive an inspection report thereafter regarding the progress made

and the amount requested in the draw.

36.    Thereafter, Loan Services emailed the Plaintiff documenting the total draw request,

the amount approved and the difference (if any); the email set forth general reasons for the denial

or withholding of any requested funds.

37.    The draw request protocol presented multiple opportunities for delay by Loan

Services, and differed drastically from generally accepted AIA practices for funding commercial

construction projects.

38.     While a typical commercial draw request package would include an AIA draw request with attendant invoices and partial lien waivers of the various subcontractors to be paid, followed by an inspection to fund the work-in-place, Loan Services' request protocol was deliberately haphazard, disorganized, and inherently inefficient such that it repeatedly caused delays in funding the Projects' ongoing costs.

39.     First, Plaintiff relative to each Project would submit a draw request, along with invoices, using the Loan Services required form and online portal.

40.     Thereafter, from its offices in Washington State, Loan Services, thousands of miles from the Philadelphia, Pennsylvania Projects, would coordinate with an outside contractor to arrange for inspection of the relevant Project.

41.     Upon information and belief, Loan Services' independent contractor would then further subcontract the inspection out to a small, regional inspector in Philadelphia.

42.     This process, with Loan Services lacking the infrastructure to make up for its far removed location, created an intentionally cumbersome procedure, and delayed communications between Loan Services and the local inspector appearing at each Project site.

43.     For example, after draw requests were delayed by the filtration of Loan Services' inspection requests through a third-party intermediary, the subcontracted local inspectors were not provided with information identifying the elements constructed-in-place they were to be inspecting prior to arrival at the Project .

44.     Instead, inspectors would arrive with a generic list of categories and line items subject to the draw requests, but none of the information from the draw request package provided to Loan Services by the Plaintiffs. Specifically, invoices or descriptions of work completed provided to Loan Services, were not transmitted to the inspector who visited the Project.

45.    Without detailed direction from Loan Services, the inspectors submitted to Loan Services photographs of random constructed-in-place elements within the various categories provided by Loan Services and sent the same back to Loan Services without necessarily inspecting the work that was actually the subject of the draw request.

46.    Worse yet, on occasion inspectors arrived *with inaccurate information*, rendering the inspection wholly useless.

47.    Critically, Plaintiffs were never able to access the inspectors' submissions to Loan Services, such as reports, write-ups, analyses, etc.

48.    After an arbitrary period of time following the receipt of the inspection report by Loan Services, Loan Services issued an automated email with limited information regarding its arbitrary funding decisions with regard to line items from the draw request.

49.    On numerous occasions, Plaintiffs were advised by Loan Services to satisfy certain costs for in-place work with promises of reimbursement from the Loans; however, when Plaintiffs satisfied those costs, no reimbursement materialized.

50.    The baseless and haphazard denial of draw requests was contrary to the terms of the Loan Documents; to wit, Section 5.3 of the various Promissory notes provides:

> The allowed amount of each Draw shall be determined, at Lender's option: (i) by Lender's review of receipted invoices provided by Borrower and Lender's confirming physical inspection; (ii) on a percentage completion basis with reference to the approved Budget for the Project, as established by a physical inspection of the development or construction conducted by Lender or its agent (or, at Lender's sole discretion, as disclosed by the information provided by Borrower in the Draw Affidavit); or (iii) by a combination of the foregoing methods. Lender shall make Draws only for the categories and line items set forth in the Budget. Borrower shall have no right to reallocate costs or Loan proceeds between different line items or between categories without Lender's specific written approval. Lender shall require that Borrower contribute any Equity Funds necessary to pay any portion of Eligible Costs incurred to the date of Borrower's Draw request that are not covered by the applicable Draw. Draw inspections will be made by in house Lender personnel or by a third-party architect/engineer, as required by Lender.

> Borrower shall pay inspection costs on demand. Date down endorsements to title
> insurance policies and/or lien releases may be required as a condition to making
> any Draw. Lender may also require the establishment or replenishment of any
> interest reserve account as set forth below prior to making any Draw.

Exs. 1-4  at Promissory Note, § 5.3.

51.    Further draw delays were based upon Loan Services' arbitrary internal scheduling deadlines and procedures including, frequently postponed committee meetings.

52.    Complicating Plaintiffs' efforts to receive funds as permitted under the Loan Documents, the $100 million in collective Loans were frequently not assigned to loan servicers, loan officers or other official points of contact within Loan Services for extended periods of time -- four months in the case of the Indiana Heights Project. This allowed draw requests to languish for weeks and left Plaintiffs without anyone to contact at Loan Services.

53.    On numerous occasions, Plaintiffs' draw requests were escalated to Val Moses, and even then addressed on an *ad hoc*, disjointed and belated basis.

54.    Upon information and belief, also during this period, Loan Services and Saluda Grade materially modified their business model. Where they formerly offered fixed rate loans, they shifted to floating rates for all new loan originations.

55.    Upon information and belief, Loan Services made this change in order to benefit from increases in the federal funding rate, which led to market increases in interest rates nationally.

56.    Upon information and belief, the loans financed by Saluda Grade, which Loan Services used to fund loans to builders like Plaintiffs, either matured or already carried adjustable rates. This caused Loan Services' cost of capital to materially increase when interest rates rose.

57.    When the Loans' initial maturity dates arrived, Loan Services refused to honor the Loan Documents' contractual extension terms.

58.    Instead, without justification and contrary to the plain terms of the Loan Agreements, Loan Services claimed discretionary denials of the Plaintiffs' requests for extensions.

59.    Instead, Loan Services offered to grant conditional extensions, if the Plaintiffs agreed to (a) pay extortionate extension fees (contrary to the guaranty of no extension fee with regard to first extensions), and (b) convert the Loans to substantially higher fixed interest rates, drastically increasing Plaintiffs' borrowing costs.

60.    The Plaintiffs already accepted tens of millions of dollars in funding draws, and were compelled to accede to Loan Services' extortionate demands. Plaintiffs' only other options were to sue Loan Services or seek an alternate lender; either option would accrue hundreds of thousands of dollars of unanticipated lending costs, and jeopardize the continued viability of the midstream Projects. Loan Services thus placed Plaintiffs in a true Catch-22.

61.    Loan Services' demands for onerous and extorted extension terms (in violation of the Loan Documents) extracted unpermitted extension fees from Plaintiffs' respective interest reserves, as well as from other line items in the Projects' respective budgets, thereby reducing funds allocated for certain line items and interest reserve to inadequate levels, and setting up additional opportunities for Loan Services to claim future payment defaults.

62.    Loan Services also began repeatedly and unjustifiably refusing to fully fund Plaintiffs' draw requests, while significantly delaying the funding that was issued. This set the stage for Loan Services to claim (manufactured) maturity defaults in the future when Loan Services' funding delays caused the Projects to miss their anticipated completion dates

63.    Loan Services and its servicing team, including Valerie Moses, Bill Finzer, Lynda Rodriguez, David Schultz, Michele Howe, Curt Altig, and former employee Katherine Butler,

deliberately avoided client outreach, were non-responsive to borrower inquiries and delayed extension discussions.

64.     As a result of Defendants' intentional delay, Plaintiffs incurred significant and unnecessary interest expense and additional construction costs to secure labor and materials for the Projects.

65.     The Germantown Project ground to a halt as a result of Defendants' failure to fund draws as required and remains, as of yet, incomplete.

66.     Plaintiffs have suffered needless, substantial, and irreparable harm to their professional reputations and business interests due to Loan Services' conduct.

67.     The harm includes damaged relationships with subcontractors and material suppliers, many of whom are small business owners.

### B. Factual Allegations Specific to the Germantown Project

68.     Plaintiff Trolley Car is the borrower under the Germantown Project and Germantown Loan. Ex. 1, Promissory Note, p.1.

69.     The Germantown Loan is in a principal amount of $33,071,970.86. *Id.*

70.     The Germantown Loan is guaranteed by non-parties Samuel Blake and Glenn Falso. *See id.* at Carveout Guaranty & Performance and Completion Guaranty.

71.     The Germantown Project and Germantown Loan were associated with the development of real property located at 7611-17 Germantown Avenue in Philadelphia, Pennsylvania. *Id.* at Loan Agreement, Ex. A (legal description of the property).

72.     As with all of the Loans at issue in this action, the ultimate structure of the Germantown Loan would be dictated by the specific and onerous requirements of Loan Services' back-end capital provider, Defendant Saluda Grade.

73. During negotiations with Loan Services regarding the Germantown Loan, Trolley Car specifically indicated that it required 30 months to complete the Germantown Project.

74. Trolley Car also ***specifically*** raised concerns in the course of negotiations about avoiding interest rate hikes in the event that a loan extension was required.

75. Based on discussions between Trolley Car and Loan Services, on or about November 19, 2021, non-party Josh Dormody of Welcomelend, Trolley Car's finance broker, emailed Messrs. Blake and Falso attaching an initial letter of intent. Therein, Mr. Dormody described the basic terms of the offer from Loan Services as follows:

(a) The commitment was for approximately $33,000,000.00;

(b) The commitment required limited recourse guarantees from Messrs. Blake and Falso;

(c) The commitment carried an interest rate of 7.75 percent on drawn funds only;

(d) The financing costs of the financing amounted to approximately 2.9 percent, including the broker's 1 percent fee;

(e) The commitment provided a 30-month term, with two six-month extension options;

(f) The financing would require no deposit; and

(g) The following breakdown of funding proceeds:

| | |
|---|---|
| Refinance/Payoff of Prior Financing | $ 2,800,000.00 |
| Hard Cost | $ 25,099,995.00 |
| Soft Cost | $ 2,000,000.00 |
| Financing / Closing Costs | $ 3,171,976.00 |
| Construction Holdback / Remaining Costs | $ 33,071,971.00 |
| Deposit | $ 0.00 |
| Total Loan Amount | $ 33,071,971.00 |

A true and correct copy of the November 19, 2021 email from Mr. Dormody is attached hereto as **Exhibit 5**. A true and correct copy of the November 19, 2021 letter of intent is attached hereto as **Exhibit 6**.

76.    The November 19, 2021 letter of intent accommodated the 30-month required timeline to complete the Germantown Project, and included extensions to account for delays and complications.

77.    However, when the November 19, 2021 letter of intent was presented to Saluda Grade during the underwriting process, Saluda Grade balked, indicating that its securitization requirements limited the loan term to 24 months.

78.    The bait-and-switch conducted by Loan Services and Saluda Grade surprised and frustrated Trolley Car in light of its insistence in negotiations that a 30-month term loan was necessary to complete the Germantown Project and its clearly expressed concern regarding rising interest rates.

79.    After further negotiation, Trolley Car, Loan Services, and Saluda Grade agreed that the 24-month term would be accompanied by three ***by-right*** six-month extensions (instead of the two contained in the November 19, 2022 letter of intent), ***with a commitment to waive the fee for the first of the three extensions***, which agreement was documented in the Promissory Note at Section 7.7.

80.    This compromise was intended to provide an effective 30-month term (the initial 24-month term combined with the first, fee-free six-month loan extension). The two subsequent by-right six-month loan extensions were further material inducements to entice Trolley Car to accept the Germantown Loan.

81.    Thereafter, Loan Services refused to honor the negotiated maturity date extension options, which were explicitly intended *not* to include an increase the interest rate, in violation of Section 7.8 of the Note. Exhibit 1 at Promissory Note, § 7.8.

82.    Instead, as the Germantown Loan approached maturity in February of 2024, Loan Services demanded a 3.75 percent per annum rate increase as a condition of the first extension—in essence, extorting Trolley Car in exchange for the ability to exercise its contractual right to a loan extension.

83.    Trolley Car had already drawn significant sums from the Germantown Loan, and made significant monthly interest payments.

84.    Trolley Car was left with two options: (a) insist upon its contractual extension without an interest rate increase, and risk maturity default while making significant interest payments; or (b) agree to the extortionate terms of Loan Services and Saluda Grade, avoid a maturity default and restart the flow of much-needed capital to the Germantown Project.

85.    Under economic duress, Trolley Car ultimately accepted a 3.75percent rate increase, resulting in *significant* additional interest expense.

86.    This increase was memorialized in a First Amendment to the Germantown Loan dated March 13, 2024. A true and correct copy of the First Amendment is attached hereto as **Exhibit 7**.

87.    Loan Services' departure from the negotiated loan terms was not limited to extension of the Germantown Loan's maturity date.

88.    Loan Services also began to exhibit a pattern of even more egregious deliberate delays in funding draw requests, pretextual partial funding and non-responsiveness designed to starve the Germantown Project of capital. As intended, Loan Services' acts and inaction slowed the Germantown Project's progress and delayed its completion.

89.    For example, on April 11, 2022, Loan Services issued a partial approval for $528,597.72 of a $723,000.00 request, withholding $194,402.28 of the requested loan draw. A true

and correct copy of the email issued by Loan Services concerning the April 11, 2022 draw request is attached hereto as **Exhibit 8**.

90.     Loan Services' stated "reason" for withholding any portion of the aforementioned draw request was entirely pretextual; $65,000.00 requested for "M-1100400 - Insurance (Soft Cost)" was denied on the stated basis of "no clear invoice," despite the fact that Trolley Car provided Loan Services with an invoice substantiating the insurance cost.

91.     Three separate "Profit/Overhead" costs were also reduced; Loan Services claimed it was "unable to approve[] amount requested based on overall project % complete." *See* Ex. 8.

92.     Trolley Car was never provided documentation as to why any specific line item was reduced; upon information and belief, Loan Services lacked sufficient information to substantiate any reduction based upon the deliberately ineffective draw request and inspection protocol employed by Loan Services as discussed herein, *supra*.

93.     Although the draw was partially approved by Loan Services on April 11, 2023, the wiring of funds was delayed, forcing representatives of Trolley Car to email Loan Services on May 1, 2023 to inquire as to the status of the funds.

94.     Loan Services responded that the inspection report supporting the draw request was received "after wire cutoff." A true and correct copy of the May 1, 2023 email chain between Loan Services and Trolley Car is attached hereto as **Exhibit 9**.

95.     On September 25, 2023, Sam Blake on behalf of Trolley Car notified Azure Brown at Loan Services of a "challenging, unforgiving vein of rock that was under the build site[.]" A true and correct copy of the September 25, 2023 email is attached hereto as **Exhibit 10**.

96.    The email documented a significant unforeseen condition, the exact circumstance contemplated by Trolley Car when negotiating no-interest by-right loan extension provisions in the original Loan Documents.

97.    Instead of working with Trolley Car, Loan Services tightened its already improper restrictions, and escalated its bad-faith practice of withholding and rejecting draw requests.

98.    On December 28, 2023, with the original February 8, 2024 maturity date approaching, Trolley Car's draw request for $986,300.00 was partially approved in the amount of $969,243.64. A true and correct copy of the Loan Services draw request funding email is attached hereto as **Exhibit 11**.

99.    Loan Services pretextually denied $4,500.00 for "Surveying / Engineering" due to purportedly "missing supporting documentation." *Id.*

100.    Loan Services also reduced the "Temp. Utilities" line item based on "percent completed, 49%." *Id.*

101.    On March 1, 2024, in the midst of negotiations with Loan Services to extend the Germantown Loan Term, Trolley Car representative Glenn Falso emailed former Loan Services employee Katherine Butler, reminding Ms. Butler that draw requests had been pending for three weeks. A true and correct copy of the March 1, 2024 email is attached hereto as **Exhibit 12**.

102.    Mr. Falso stated: "time is money," and noted that the "**$90k a month interest is nothing to sneeze at**. Elevators take time to build." *Id.*

103.    In response, Ms. Butler determined that Loan Services would not fund the long-pending draw request.

104.    Defendants' conduct as the Germantown Loan reached its original maturity date was clearly undertaken to impose economic duress on Trolley Car and thereby force it to agree to

the onerous extension terms offered by Loan Services and Saluda Grade, which profited Defendants.

105.    In addition, Ms. Butler introduced a new draw request administrative hurdle: a UCC filing, which she termed a "non-negotiable requirement." *Id*.

106.    This "non-negotiable requirement" was <u>not</u> a requirement under the Germantown Loan Documents. *See* Ex. 1-4.

107.    Following the execution of the First Amendment, Loan Services' deliberate underfunding escalated dramatically, all while Loan Services and Saluda Grade continued to accept significant interest payments on capital.

108.    On June 1, 2024, Trolley Car received an automated notice that the Germantown Loan's interest reserve (originally funded for $2,000,000 based upon the original Loan term that the interest rate would not increase in the event of an extension) was depleted. A true and correct copy of the aforementioned notice is attached hereto as **<u>Exhibit 13</u>**.

109.    Five days later, on June 6, 2024, Loan Services approved only $1,067,493.94 of a $2,483,475.77 draw request; a shortfall of $1,415,981.83. A true and correct copy of the June 6, 2024 email documenting Loan Services' partial approval is attached hereto as **<u>Exhibit 14</u>**.

110.    Loan Services entirely denied the request for $1,300,000.00 for "M-102000-Garage/Basement Concrete" on the opaque stated basis of "availability based on line item completion." *Id.*

111.    Loan Services also made reductions to all three requests for "Profit/Overhead." *Id.*

112.    Trolley Car was never provided documentation supporting reductions to any specific line item request; upon information and belief, Loan Services lacked sufficient

information to substantiate any reduction based upon the deliberately ineffective protocol it employed.

113.    This was followed by Loan Services' $202,518.73 rejection of a September 13, 2024 draw request, and its $11,000.24 rejection of an October 23, 2024 draw request. A true and correct copy of the email evidencing the rejection is attached hereto as **Exhibit 15**.

114.    Loan Services' communication and funding "slow roll" was now standard practice.

115.    On December 10, 2024, non-party Siobhan Harmon, on behalf of Trolley Car, submitted a draw request for $853,709.99, which included a reallocation of $418,709.99 from the "developer fee" line item to the "depleted interest reserve."

116.    On December 11, 2024, Katherine Butler responded that the draw would be "reviewed."

117.    Without further communication from Loan Services, on December 16, 2024 Ms. Harmon followed up on Trolley Car's $853,709.99 draw request.

118.    On December 17, 2024, Loan Services partially approved only $377,000.00 of the draw request, leaving a $476,709.99 shortfall. A true and correct copy of the email evidencing the rejection is attached hereto as **Exhibit 16**.

119.    Critically, Loan Services rejected the "M-107000-Profit/Overhead (Soft Cost)-Developer Fee." *Id.* This was the line item subject to reallocation in light of the depletion of the interest reserve.

120.    Trolley Car was never provided documentation supporting reductions to any specific line item request; upon information and belief, Loan Services lacked sufficient information to substantiate any reduction based upon the deliberately ineffective protocol it employed.

121.    After processing this denial, Ms. Butler emailed Trolley Car, claiming she was "out sick" and asking to "discuss" the reallocation issue she had already denied. A true and correct copy of the aforementioned communication dated December 17, 2024 is attached hereto as **Exhibit 17**.

122.    On January 3, 2025, Sam Blake, on behalf of Trolley Car, followed up with loan Services regarding the ignored December 10th loan draw request and line item reallocation. A true and correct copy of the aforementioned communication dated January 3, 2025 is attached hereto as **Exhibit 18**.

123.    On January 8, 2025, Siobhan Harmon also followed up with Loan Services, again asking for an update from Ms. Butler regarding the reallocation of $418,709.99 from the "developer fee" line item to the "depleted interest reserve." Ms. Butler replied only that she would "call Siobhan." A true and correct copy of the aforementioned communication dated January 8, 2025 is attached hereto as **Exhibit 19**.

124.    Having received no call from Ms. Butler or anyone else at Loan Services, Ms. Harmon emailed again on January 9, 2025, "requesting confirmation that the reallocation is complete as a wire will need to be initiated for interest if not." A true and correct copy of the aforementioned communication dated January 9, 2025 is attached hereto as **Exhibit 20**.

125.    That same day, Trolley Car received an automated email indicating that the Germantown Loan would be maturing on February 8, 2025. A true and correct copy of the aforementioned automated notification dated February 8, 2025 is attached hereto as **Exhibit 21**.

126.    Loan Services' deliberate delays and partial funding of Trolley Car's draw requests intentionally pushed Trolley Car into yet another induced maturity default.

127.    On January 10, 2025, with no response from Ms. Butler, Mr. Blake emailed Loan Services *again* about the line item reallocation and the impending interest payment. A true and

correct copy of the aforementioned communication dated January 10, 2025 is attached hereto as **Exhibit 22**.

128.    On January 30, 2025, Loan Services issued another severe partial denial, funding only $673,330.79 of a $1,000,840.00 request, and denying $327,509.21 of the request. A true and correct copy of the email reducing the January 30, 2025 draw is attached hereto as **Exhibit 23**.

129.    Loan Services denied $171,190.00 for "M-103100-HVAC" and $43,000.00 for "M-103200 - Fire Sprinklers," both denials purportedly attributed to "availability based on line item completion." *Id.*

130.    Trolley Car was never provided documentation supporting reductions to any specific line item request; upon information and belief, Loan Services lacked sufficient information to substantiate any reduction based upon the deliberately ineffective protocol it employed.

131.    Loan Services then weaponized these very vendor payments. On February 11, 2025, Ms. Harmon emailed Ms. Butler about unpaid vendor invoices sent on January 31, 2025. A true and correct copy of the aforementioned communication dated February 11, 2025 is attached hereto as **Exhibit 24**.

132.    Ms. Butler replied that a new "draw request" was required even though the invoices were transmitted to Loan Services in January. *Id.*

133.    Ms. Harmon immediately corrected Ms. Butler, reminding her that Loan Services itself requested the invoices be transmitted for direct payment. *Id.* Ms. Harmon also pointed out that Trolley Car would have submitted a draw request on January 31 if Loan Services had communicated the "new draw request" requirement. *Id.*

134.    Incredibly, on February 13, 2025 Ms. Butler further delayed payment on the draw request, demanding "fully executed contract[s]" supporting the already-submitted invoices. *Id.*

135.    In response, Ms. Harmon indicated that materials related to the invoices were already transmitted to Loan Services on January 31, 2025; nevertheless, Ms. Harmon resent the supporting documentation. *Id.*

136.    On February 18, 2025, Ms. Butler again demanded "executed copies" of contracts supporting the submitted invoices. *Id.*

137.    Ms. Harmon responded that the vendors at issue only issued quotes; invoices would be issued once the work was complete. *Id.*

138.    Desperate to comply with Loan Services' requirements and obtain funding, Ms. Harmon, nonetheless, sought to execute contracts with the vendors; she secured a written agreement with one vendor but the other – Riley Sales – did not issue contracts, only quotes and invoices (which Loan Services already possessed). *Id.*

139.    On February 19, 2025, Ms. Harmon emailed Loan Services to convey that Riley Sales was holding equipment pending payment of the deposit (as evidenced by the invoice sent to Loan Services on January 31, 2025). A true and correct copy of the aforementioned communication dated February 19, 2025 is attached hereto as **Exhibit 25**.

140.    Only after this multi-week, pretextual delay did Loan Services approve the $214,000.00 draw on February 20, 2025, specifically funding the Riley Sales (HVAC) and TDK Enterprises (Fire Sprinklers) invoices which Loan Services had previously denied on January 30.

141.    On March 18, 2025, Loan Services denied $236,873.02 of Trolley Car's $679,268.37 draw request. A true and correct copy of the reduction dated March 18, 2025 is attached hereto as **Exhibit 26**.

142.    Trolley Car was never provided documentation supporting reductions to any specific line item request; upon information and belief, Loan Services lacked sufficient information to substantiate any reduction based upon the deliberately ineffective protocol it employed.

143.    On April 16, 2025, Loan Services denied $259,937.95 of Trolley Car's $747,890.00 request. A true and correct copy of the reduction dated April 16, 2025 is attached hereto as **Exhibit 27**.

144.    Trolley Car was never provided documentation supporting reductions to any specific line item request; upon information and belief, Loan Services lacked sufficient information to substantiate any reduction based upon the deliberately ineffective protocol it employed.

145.    None of Loan Services' draw denials reflected the actual conditions of the Germantown Project; instead, Loan Services used "work completed" as a pretext to deny draw requests.

146.    Trolley Car was never provided documentation supporting reductions to any specific line item request; upon information and belief, Loan Services lacked sufficient information to substantiate any reduction based upon the deliberately ineffective protocol it employed.

147.    The situation became so critical that on April 17, 2025, Sam Blake, on behalf of Trolley Car, emailed Defendant Bill Finzer directly. A true and correct copy of the April 17, 2025 email is attached hereto as **Exhibit 28**.

148.    Mr. Blake indicated that an additional $7,000,000.00 of funding was required for the condo-conversion budget, a circumstance forced on Trolley Car by the atmosphere of

uncertainty cultivated by Loan Services relative to the reliability of draw funding, as well as the persistent, unnecessary delays caused by Loan Services' failure to timely fund requests as submitted. *Id.*

149.    Indeed, absent the conversion, which permitted an iterative process of selling residential condominium units as they were completed within the Project, the apartments-for-rent concept would have required full completion of construction followed by a one-off sale of the entire asset.

150.    Given the ongoing delays caused by Loan Services, it was impossible for the Project to achieve completion under the apartments-for-rent concept and, therefore, Trolley Car was forced to abandon the same in favor of condominiums.

151.    On May 9, 2025, Loan Services reduced a draw request of $10,148,519.10 to $431,318.74, rejecting $9,717,200.36 of the request. A true and correct copy of the May 9, 2025 reduction is attached hereto as **Exhibit 29**.

152.    The denial was purportedly based upon "availability based on line item completion." *Id.* Loan services rejected $693,000 for "M-103100-HVAC," $457,000 for "M-103200-Fire Sprinklers," $713,000.00 for "M-104300-Drywall." *Id.* Funding was also denied for Insulation, Exterior Doors, Interior Doors, Cabinets, Countertops, Appliances and more. *Id.*

153.    Trolley Car was never provided documentation supporting reductions to any specific line item request; upon information and belief, Loan Services lacked sufficient information to substantiate any reduction based upon the deliberately ineffective protocol it employed.

154.    On June 18, 2025, with the Germantown Project on the brink of collapse, Sam Blake emailed Defendant Valerie Moses, "inquiring as to approval of funding. . . we have been

requesting a draw for several weeks to no avail and are in danger of a work stoppage as a result." A true and correct copy of the June 18, 2025 email is attached hereto as **Exhibit 30**.

155.    On July 29, 2025, Sam Blake sent a renewed reallocation of funds request and indicated that Trolley Car was interested in "implement[ing the request] asap as we are working with great momentum.]" A true and correct copy of the email dated June 29, 2025 is attached hereto as **Exhibit 31**.

156.    Frustrated at being long ignored by Loan Services, Mr. Blake re-sent the request on August 6 to Defendants Michele Howe and David Schultz, referencing "promises made to assist but nothing completed to date" and warning "we will lose . . . momentum without the reallocation[.]" *Id.*

157.    On August 7, 2025, Mr. Blake sent a final email to Howe and Schultz, stating: "without the requested reallocation . . . we no longer have the ability to keep the project moving forward" and noting the reallocation "has been 'on the table' . . . since April  . . . [Loan Services] "has continued to make promises that they did not keep. (Starting with the denial 20 months ago of our original loan terms regarding extensions) . . . We have been given the 'slow roll' for 20 months. This has caused us tremendous harm . . . We are now, unfortunately forced to close our gates and shut down the project at close of business tomorrow 08/08/25[.]" *Id.*

158.    In response, Defendant David Schultz completely disregarded the Germantown Project's imminent shutdown, in a frank demonstration of the Enterprise's bad faith. He assured Mr. Blake that Loan Services would "be in a position to provide meaningful feedback next week." *Id.*

159.    Of course, no further update was provided. Instead, after Mr. Falso replied that Loan Services failed to communicate yet again, Defendant Schultz stated that the "committee" making decisions with respect to the Germantown Loan was "postponed" without explanation. *Id.*

160.    Mr. Blake responded that Loan Services was "follow[ing] the same 20 month pattern of delay," and confirmed the August 8, 2025 shutdown of the Germantown Project. *Id.*

161.    Loan Services' conduct culminated in the collapse of the Germantown Project on August 8, 2025.

162.    On August 11, 2025, non-party Josh Dormody emailed on behalf of Trolley Car: "We've been requesting clarity for months. . . The typical response has been, 'We should know something around Tuesday next week.' Now, time has run out[.]" A true and correct copy of the reduction dated August 11, 2025 is attached hereto as **Exhibit 32**.

163.    On August 21, 2025, frustrated with Loan Services' delays, non-communication and partial loan draw disbursements, Sam Blake, on behalf of Trolley Car, emailed Defendant Schultz, complaining that Trolley Car's draw requests "are being ignored," and the funding delays prevent marketing of units at the Germantown Project, as "we cannot predict a finish date[.]" A true and correct copy of the email dated August 21, 2025 is attached hereto as **Exhibit 33**.

164.    On August 22, 2025, Glenn Falso sent an email, addressed to Sam Blake but clearly intended for the copied David Schultz, Valerie Moses, and Curt Altig, stating: "what the heck is going on here?! We have CASH buyers ready to make unit deposits and are hearing crickets from our lender?" *Id.*

165.    Finally, Defendant David Schultz responded: "respectfully, this loan matured on August 7th, 2025, and is past due in excess of $1.3mm in interest and fees[;]" he instructed Trolley Car that all future draws "need to go on direct pay[.]" *Id.*

166.    Mr. Blake replied, reminding Schultz that he personally directed Trolley Car to submit the draw request (which Loan Services was ignoring), and that Mr. Blake had "been beating the drum for reallocation . . . for the last year" as the solution to the interest reserve issue and to get the Germantown Project back on track. *Id.*

167.    Loan Services' conduct brought the Germantown Project to a "standstill" and forced Trolley Car to convert the Germantown Project from apartments to condominiums, resulting in a loss of 32 potential units.

168.    On September 25, 2025, a reduced draw request was approved by Loan Services for vendors including D & C Carpentry INC ($3,400.00), ANC Builders Inc ($94,796.53), Clear Light Electric ($300,000.00) and Able Plumbing Supply Company ($42,151.75). A true and correct copy of the email chain containing the reduction dated September 25, 2025 is attached hereto as **Exhibit 34**.

169.    Loan Services failed to timely fund the approved draw. On October 3, 2025, Sam Blake stressed the urgency of payment of the already-approved draw, stating that "things are getting heated[.]" *Id.*

170.    On October 4, 2025, Sam Blake confirmed that the draw remained unfunded. *Id.* Mr. Blake was "dumbfounded by the lack of response" from Loan Services, and stressed that the timely payment of subcontractors was vital to the success of the Germantown Project. *Id.*

171.    Demand was made on October 10, 2025, for Loan Services to immediately fund the outstanding draw request and execute a one-year, interest-free extension of the Germantown Loan's maturity date. A true and correct copy of the October 10, 2025 demand letter is attached hereto as **Exhibit 35**.

### C. *Factual Allegations Specific to the Indiana Heights Project*

172.    The Plaintiffs for the Indiana Heights Project are Plaintiffs Indiana Heights.

173.    The financing of the Indiana Heights Project consists of two Indiana Heights Loans:

    a.    the First Indiana Heights Loan No. 72759 in the principal amount of $36,000,000.00; and

    b.    the Second Indiana Heights Loan No. 72798 in the principal amount of $9,588,136.68.

174.    The Indiana Heights Loans are guaranteed by non-parties Mark D. Quigley and Glenn A. Falso, Jr.

175.    Loan Services committed itself to the First Indiana Heights Loan on or about March 30, 2022. Ex. 2.

176.    Loan Services committed itself to the Second Indiana Heights Loan on or about March 30, 2022. Ex. 3.

177.    The First Indiana Heights Loan carried a note rate of 7.125 percent per annum while the Second Indiana Heights Loan carried a note rate of 9.5 percent per annum, resulting in a blended interest rate across the Indiana Heights Loans of approximately 7.6 percent per annum. Ex. 2

178.    Indiana Heights paid a combined origination fee in excess of $680,000.00 at closing to secure the Indiana Heights Loans. Ex. 2 & 3.

179.    The originally scheduled maturity date for the two Indiana Heights Loans was March 19, 2024. Ex. 2-3.

180.    The structure of the Indiana Heights Loans was dictated by the securitization requirements of Loan Services' capital provider, Saluda Grade.

181.    The original letter of intent contemplated a 36-month term to accommodate the scope of the project. However, Saluda Grade mandated a 24-month term to fit its securitization model.

182.    To induce the Plaintiffs to accept this compressed timeline, Loan Services executives – including Blake Rodgers, Mark Woodbridge, and Robert Trent – represented that the shorter term was a formality and that extensions would be granted to ensure completion of the Indiana Heights Project.

183.    Specifically, the executed Promissory Notes for both loans included a 0.00 percent extension rate bump. Section 7.7 of the Promissory Notes states: "Effective as of the originally scheduled Maturity Date, the Note Rate for the Loan shall increase with any such extension to a rate per annum equal to 0.00% above the original Note Rate." Ex. 2-3 at Promissory Notes, § 7.7.

184.    The Plaintiffs proceeded with the loan documentation in order to secure fixed rates ahead of anticipated interest rate hikes.

185.    Prior to closing, Loan Services' personnel Blake Rodgers, Mark Woodbridge, and Robert Trent provided assurances that Loan Services was focused on supporting developers, promptly funding draws, and avoiding foreclosure except in extreme cases.

186.    These personnel also indicated to Indiana Heights that the modified loan structure was primarily intended to satisfy the requirements of Loan Services' capital partners.

187.    Despite its promises, Loan Services subsequently engaged in a pattern of starving the Indiana Heights Project of capital by arbitrarily denying and delaying loan draw requests for completed work and purchased materials, and otherwise refusing to fund necessary draws for work to begin.

188.    Indeed, by the time of its very first draw request, Indiana Heights faced funding delays.

189.    Relative to the first draw request, on April 7, 2022, Glenn Falso informed Loan Services representatives that "wolves [were] howling at" Indiana Heights' door due to Loan Services' funding delays. A true and correct copy of the email chain containing the aforementioned email dated April 7, 2022 is attached hereto as **Exhibit 36**.

190.    Highlighting the deliberate inefficiency and lack of organization of its draw request processing protocol, Loan Services purported to issue an automated reply to a draw request purportedly made by Indiana Heights in the amount of $24,158,358.36. Indiana Heights *never* submitted such a drastically large draw, nor would it *ever* permit payables to accrue to such levels. Loan Services generally denied $23.5 million of the purported $23.15 million draw request. A true and correct copy of the May 2023 reduction is attached hereto as **Exhibit 37**.

191.    Upon information and belief, the errant May 2023 loan draw denial was based upon Loan Services' inaccurate record keeping and inefficient messaging with third-party inspectors.

192.    In September 2023, Indiana Heights requested $1,057,500.00. Loan Services released only $602,760.00, denying $309,740 for "Foundation Concrete" and cutting "Framing Labor" by $145,000. Loan Services denied $309,740.00 of the loan draw request, again citing "No new work started," ignoring the visible progress on site. A true and correct copy of the reduction from September 2023 is attached hereto as **Exhibit 38**.

193.    Indiana Heights was never provided documentation supporting reductions to any specific line item request; upon information and belief, Loan Services lacked sufficient information to substantiate any reduction based upon the deliberately ineffective protocol it employed.

194.    In the spring of 2024, when the penalty-free extension of the Indiana Heights Loans was scheduled (Ex. 2-3, § 7.7), Loan Services disregarded its prior assurances and imposed extension fees and significantly higher interest rates representing an interest hike of nearly 3.4 percent, along with providing that such higher interests rates were floating rates as opposed to the previous fixed rates.

195.    Indiana Heights was faced with the impossible choice of continuing to pay carrying costs and interest on the incomplete Indiana Heights Project or accepting Loan Services' extortionate extension fees and interest rate increase.

196.    In the end, because Loan Services refused to fund *any* draws in the absence of an extension, Indiana Heights was forced to accept the loan extension on Loan Services' terms.

197.    On October 29, 2024 (Draw 22), Loan Services released only $3,560,500 of a $4,230,500 draw request. This created a shortfall for Indiana Heights of nearly $700,000.

198.    Loan Services completely withheld $150,000 for Water, Sewer, and Electric connection fees on the purported basis of "invoicing." Loan Services arbitrarily reduced Drywall funding by $120,000 and "Landscaping/Fencing/Pools" by $400,000.00 on the particularly opaque basis of "% complete." A true and correct copy of the October 29, 2024 reduction is attached hereto as **Exhibit 39**.

199.    Indiana Heights was never provided documentation supporting reductions to any specific line item request; upon information and belief, Loan Services lacked sufficient information to substantiate any reduction based upon the deliberately ineffective protocol it employed.

200.    On January 23, 2025 (Draw 23), Indiana Heights requested $1,475,000.00 to push the Indiana Heights Project toward completion.

201.    Loan Services released only $1,124,315.86 of the requested loan draw, denying all funding for landscaping ($50,000.00) and pools ($200,000.00), and reducing the contingency disbursement. Loan Services cited "overall project % complete" as its basis for denial, and effectively prevented Indiana Heights from finishing the very items needed to reach completion. A true and correct copy of the reduction associated with the January 23, 2025 draw is attached hereto as **Exhibit 40**.

202.    Indiana Heights was never provided documentation supporting reductions to any specific line item request; upon information and belief, Loan Services lacked sufficient information to substantiate any reduction based upon the deliberately ineffective protocol it employed.

203.    Indiana Heights submitted a draw request for approximately $1.1 million before the Indiana Heights Loans' maturity date in March 2025.

204.    Loan Services partially funded only $600,000.00 of the $1.1 million request, months after the request was submitted.

205.    Plaintiffs submitted a detailed extension proposal for the Indiana Heights Loans on June 29, 2025.

206.    Loan Services refused to engage in good faith negotiations to achieve a reasonable extension prior to the Indiana Heights Loans' maturity date.

207.    By July 2025, the Indiana Heights Project was paralyzed. Glenn Falso emailed Defendant Curt Altig on July 16, 2025 to express frustration over Loan Services' display of "little to no communication/cooperation" with Indiana Heights. A true and correct copy of the email dated July 16, 2025 is attached hereto as **Exhibit 41**.

208.    On July 18, 2025, Defendant Curt Altig admitted in writing: "Saluda is involved with our team daily on th[e]" Indiana Heights Loans, the Indiana Heights Projects, and the delays in responding to funding requests. *Id.*

209.    Ultimately, Loan Services failed to respond to Indiana Heights' June 2025 loan extension request until September 9, 2025, when Loan Services transmitted a proposed Forbearance Agreement. The proposed Forbearance Agreement offered only a 6-month extension and contained added default charges – terms which materially deviated from the initial loan discussions between Indiana Heights and Loan Services. As a result, Indiana Heights rejected the proposed Forbearance Agreement (a true and correct copy of which is attached hereto as **Exhibit 42**).

210.    Loan Services' funding delays and Indiana Heights' resulting default caused the loss of material benefits from a 10-year tax abatement previously awarded to the Indiana Heights Project. This loss increased the operating costs of the Indiana Heights Project by approximately $300,000.00 per year, and reduced the value of the Indiana Heights Project by an estimated $4,000,000.00.

211.    The Indiana Heights Project was not complete in time for the prime summer leasing season, and therefore lost a management agreement with GoldOller, a national property management company.

212.    On October 10, 2025, Indiana Heights demanded that Loan Services immediately fund the remainder of the final draw request and execute a one-year, interest-free extension of the Indiana Heights Loans' maturity date. A true and correct copy of the aforementioned demand letter is attached hereto as **Exhibit 43**.

### D.  Factual Allegations Specific to the Midvale Project

213.    The Midvale Project involved the refinance and construction of a mixed-use 5-story building containing ground-floor commercial space and 33 residential units located at 3503 Midvale Avenue, Philadelphia, Pennsylvania.

214.    The Midvale Loan No. 72629 in the principal amount of $8,218,343.90 is guaranteed by Glenn Falso. Ex. 4.

215.    Glenn Falso is the sole Member and Manager of Midvale as of January 1, 2022.

216.    The Midvale Loan was closed on January 27, 2022, with a fixed interest rate of 7.750 percent per annum, and an original maturity date of July 21, 2023. *Id.*

217.    The purpose of the Midvale Loan was to fund the refinance of the Midvale Property and the construction of a mixed-use 5-story, 33-unit residential building.

218.    At closing, Midvale paid Loan Services a substantial Loan Origination Fee of $164,366.88, which represents two percent of the total Midvale Loan amount. *Id.*

219.    As a material inducement to enter into the Loan, Midvale's promissory note explicitly provides for a by-right 180-day extension of the maturity date with no interest rate increase. Ex. 4, Promissory Note, § 7.7 ("Effective as of the originally scheduled Maturity Date, the Note Rate for the Loan shall increase with any such extension to a rate per annum equal to 0.00% above the original Note Rate[.]").

220.    Loan Services consistently denied Midvale's draw requests by rigidly applying "percentage complete" metrics that ignored the commercial reality of construction deposits and materials. *Id.*

221.    In its first draw request, Midvale requested $262,972.22. Loan Services released only $88,345.78, creating an immediate shortfall of $174,626.44 for the Midvale Project. A true and correct copy of the reduction relative to the first draw request is attached hereto as **Exhibit 44**.

222.    Loan Services denied $100,000.00 for "Structural Steel" and $50,000.00 for "Elevators" with the comment "0% Complete - no work has been completed. Needs invoicing for deposits." *Id.*

223.    In so doing, Loan Services refused to fund the deposits necessary to start the work on the Midvale Project.

224.    Midvale was never provided documentation as to why any specific line item was reduced; upon information and belief, Loan Services lacked sufficient information to substantiate any reduction based upon the deliberately ineffective draw request and inspection protocol employed by Loan Services as discussed herein, *supra*.

225.    On March 23, 2023, Midvale requested a $333,000.00 draw against the Midvale Loan, but Loan Services approved only $274,285.80. A true and correct copy of the reduction dated March 23, 2023 is attached hereto as **Exhibit 45**.

226.    Loan Services denied funding for "Windows/Sliders," but admitted in comments: "All windows/sliders on site - install in progress. Credit for materials. Labor not yet complete." *Id.* Clearly, Loan Services was improperly punishing Midvale for having materials on-site but not yet fully installed, improperly forcing Midvale to carry the costs of the windows.

227.    Midvale was thus forced to wait for funds despite approval of the request and Loan Services' prior assurances of prompt funding.

228.    Loan Services' constant delays, poor communication and refusal to employ standard loan draw protocol materially delayed the completion of the Midvale Project and impaired Midvale's ability to repay the Midvale Loan by the maturity date.

229.    Loan Services' systemic funding failures (only a portion of which are set forth herein for illustrative purposes), caused the Midvale Project to fall approximately fifteen months behind schedule.

230.    As a direct result of these delays, Midvale missed the critical window to refinance the Midvale Project in a lower interest rate environment prior to a predicted rate spike.

231.    Consequently, when the Midvale Loan reached maturity, Loan Services refused to honor the 0.00 percent rate increase provision in Section 7.7 of the Midvale Promissory Note.

232.    Instead, leveraging the economic duress of the delays it created, Loan Services forced Midvale to negotiate a maturity date extension that included a significant commitment fee and an increase to the interest rate on the Midvale Note, resulting in substantial and unnecessary additional interest expense to Midvale.

233.    Although the Midvale Project is now complete, the delays caused by Loan Services forced the Midvale Project to miss its target leasing window, significantly slowing lease-up and stabilization of the Midvale Project.

234.    The coordination between Loan Services and Saluda Grade in perpetrating the funding delays was explicit. On July 18, 2025, in response to Plaintiffs' complaints about the lack of communication and cooperation across the various Projects, Defendant Curt Altig admitted that "Saluda is involved with our team daily on this," confirming that the delay tactics were being directed by or coordinated with Saluda Grade. A true and correct email chain containing the above-referenced email is attached hereto as **Exhibit 46**.

235.    Loan Services issued a default notice to Midvale on December 13, 2024. The default declaration entirely disregarded Loan Services' own role in driving the Midvale Loan into maturity date default.

236.    Midvale made demand on October 14, 2025 that Loan Services immediately execute a one-year interest-free extension of the Midvale Loan's maturity date, requiring Loan Services to reimburse Midvale for additional interest accrual from the maturity date, fund all additional carrying costs until sale/refinancing (without interest accrual), and agree to a significant discounted payoff. A true and correct copy of the aforementioned demand letter is attached hereto as **Exhibit 47**.

## COUNT I
*Conduct and Participation in a RICO Enterprise*
*through a Pattern of Racketeering*
*18 U.S.C. § 1962(c)*

237.    Plaintiffs incorporate the foregoing paragraphs as if each were set forth at length herein.

238.    RICO provides a civil cause of action for private plaintiffs and authorizes substantial remedies, including the availability of treble damages and attorneys' fees.

239.    Establishing a RICO violation requires proof by a preponderance of the evidence of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97 (1985) (interpreting 18 U.S.C. § 1964(c)).

### A.  The Enterprise

240.     Defendants, jointly and individually, are "persons" within the meaning of 18 U.S.C. § 1961(3).

241.    Plaintiffs are each "persons" within the meaning of 18 U.S.C. § 1961(3), and each of the Plaintiffs has sustained injury to its business or property as a result of the acts and the conduct

of Defendants described herein.

242.    Defendants associated in fact as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) to originate the Loans with the specific intent of failing to honor the terms of those Loans in order to extract profits from the Plaintiffs through an ongoing, coordinated scheme.

243.    Pursuant to the Enterprise's scheme, Loan Services, as the originating and servicing lender, implemented loan terms—including initially offering "fund-in-five" speed and penalty-free maturity date extensions as a material inducement—while simultaneously structuring the underlying financing to satisfy the specific securitization requirements of its capital partner, Saluda Grade.

244.    The ultimate purpose of the Enterprise was the execution of a *systematic* "loan-to-own" scheme designed to generate profit through fraud, extortion, and eventual foreclosure on distressed collateral, rather than through successful construction project completion.

245.    The Enterprise has an ascertainable, ongoing, and continuous existence that is separate from members' discernable and distinct existences and activities.

246.    The Enterprise is an ongoing and continuing organization of entities associated for the common or shared purpose of originating the Loans, and similar financing.

247.    Each member of the Enterprise has a clearly defined role in the fraudulent affairs of the Enterprise, but also maintain its/his/her own separate and distinct existence and affairs.

248.    The Enterprise itself was conducted across state lines and in the stream of interstate commerce insofar as the Enterprise and members of the Enterprise, without limitation: (a) sent electronic communications across state lines, with various members of the Enterprise being located in states other than Pennsylvania and representatives of Plaintiffs being located primarily in Pennsylvania (as well as in other states); (b) disbursed funds via wire transfers across state lines;

and (c) accepted wire transfers across state lines.

### B. Continuous Existence

249.    The Enterprise has an ongoing and continuous existence.

250.    For at least the past several years, the members of the Enterprise associated in fact to: (a) engage in bait-and-switch tactics relative to loan underwriting and origination,            (b) engage in repeated bad faith and dilatory delays with regard to funding appropriate and documented loan draws, and (c) refuse to honor loan extension terms while exerting economic duress upon and extorting borrowers (the "**Loan-to-Own Scheme**").

251.    The Enterprise has displayed a continuity of membership throughout this time period, as its members have admitted.

252.    For example, despite working directly with Plaintiffs on the drafting of loan terms, Loan Services further directed Plaintiffs to engage in an arduous underwriting process wherein the accepted loan terms were changed under duress.

253.    By way of further example, the Individual Defendants each played a role in the Defendants' refusal to timely and fully fund draw requests, create deliberate delay in determinations on extension requests, and leverage extortionate concessions from Plaintiffs.

### C.  Separate Existence

254.    Each member of the Enterprise has an existence separate from his/her/its participation in the racketeering activities of the Enterprise.

255.    Indeed, the Enterprise is comprised of Loan Services, Saluda Holdings, Saluda Management, and each of the Individual Defendants. These Defendants are each separate entities and individuals who participate in and play a distinct role in the Loan-to-Own Scheme.

256.    Each of the Defendants also maintains a separate existence and engages in activities

and operations separate and apart from his/her/its participation in the Loan-to-Own Scheme.

257.    Thus, the Enterprise has a clear and ascertainable structure, while its members have a distinct and separate existence from the Enterprise, which is not co-extensive with their participation and operation of the Enterprise and its Loan-to-Own Scheme.

### D. Interstate Commerce

258.    The Enterprise functions, in part, by conducting its Loan-to-Own Scheme across multiple states.

259.    The Enterprise engages in and affects interstate commerce because it involves communications, negotiations, underwriting, and administration of loans issued across state boundaries pursuant to the Loan-to-Own Scheme promotion. The Enterprise also accepts payments relative to such loans across state lines.

260.    At all relevant times, each participant in the Enterprise was aware of the fraudulent nature of the Loan-to-Own Scheme, was a knowing and willing participant in the fraudulent scheme, and reaped profits therefrom.

### E. Predicate Acts

261.    Section 1961(1)(B) of RICO defines "racketeering activity" to includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth herein, Defendants have engaged and continue to engage in conduct violating each of these laws to effectuate their Loan-to-Own Scheme.

262.    Defendants executed and/or attempted to execute the above-described Loan-to-Own Scheme by, among other things, engaging in bait-and-switch tactics, extortion, and failure to adhere to agreed-upon loan terms, all of which led to significant monetary losses suffered by Plaintiffs.

263.    Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service and/or commercial interstate carriers, including, but not limited to Loan Documents, letters of intent, invoices, amendments, reports, data, summaries, statements and other materials relating to the administration of the Loan-to-Own Scheme.

264.    In executing and/or attempting to execute the above-described knowing scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire matter and things which include, but are not limited to, letters of intent, invoices, amendments, reports, data, summaries, statements and other materials relating to the administration of the Loan-to-Own Scheme.

265.    In addition, pursuant to and as part of their scheme to defraud, Defendants intended to and did receive payments from Plaintiffs and other victims of the Loan-to-Own Scheme, directly or indirectly, that were transmitted or cleared through the use of interstate wires in violation of 18 U.S.C. § 1343.

266.    Loan Services, Saluda Grade, and the Individual Defendants also aided and abetted violations of 18 U.S.C. §§ 1341, 1343.

267.    The exhibits hereto identify specific occurrences of these predicate acts, but Defendants engaged in other instances of fraudulent uses of the U.S. Mail and wire facilities. Upon information and belief, these instances have been deliberately hidden by Defendants and cannot be alleged without access to their books and records.

268.    The foregoing materials sent or received by Defendants by the U.S. Mail, internet postings, emails, wire, or other electronic media contained, *inter alia*:

    (a)    False and/or misleading representations and omissions about the terms of the Loans, the underwriting process, and the administration of the Loans;

    (b)    False and/or misleading representations regarding the risks of the Loan-to-Own Scheme; and/or

    (c)    False and/or misleading representations regarding the costs of the Loan-to-Own Scheme.

269.    Defendants' false and/or misleading representations and omissions of material facts were knowing and intentional and made for the purpose of deceiving the Plaintiffs and the other victims of the Loan-to-Own Scheme.

270.    Defendants either knew or recklessly disregarded the fact that their false and/or misleading representations and omissions were material and were relied upon by Plaintiffs and the other victims of the Loan-to-Own Scheme.

271.    Although not necessary to make out a violation of the mail or wire fraud statute, Plaintiffs relied, to their detriment, on Defendants' false and/or misleading representations and material omissions about the nature and administration of the Loans relative to the Loan-to-Own Scheme.

272.    Defendants knew the Plaintiffs relied on their false and/or misleading representations and omissions about the nature and administration of the Loans relative to the Loan-to-Own Scheme.

273.    Defendants knew that Plaintiffs and other victims of the Loan-to-Own Scheme would incur substantial cost and monetary loss as a result Defendants' false and/or misleading representations and material omissions about the nature and administration of the Loans relative to the Loan-to-Own Scheme.

### F. Pattern of Racketeering Activity

274.    Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity (violations of 18 U.S.C. §§ 1341 and 1343 as described above) within the past ten years.

275.    Each racketeering act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including the Plaintiffs (and, upon information and belief, many other victims).

276.    The multiple predicate acts of racketeering activity that Defendants committed and/or conspired to commit, or aided and abetted in the commission of, were related to each other and form part of the Enterprise's Loan-to-Own Scheme.

277.    Defendants' acts pose a clear threat of continued racketeering activity, as evidenced by the ongoing underwriting of loans similar to the Loans described herein, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

278.    The sustained misconduct alleged by Plaintiff against the Enterprise constitutes a pattern of racketeering activity actionable under RICO.

279.    For example, but without limitation, beyond the bait-and-switch tactics employed by Defendants when underwriting the Loans, each of the Plaintiffs experienced the following in the administration of its Loans by Defendants:

    a.    the terms of the Loans were not honored by Loan Services and Saluda Grade;

    b.    the Individual Defendants were deliberately non-responsive or issued repeatedly delayed responses in administrating the Loans;

    c.    Defendants, in concert and with regard to each Plaintiff and each Loan, refused or

otherwise failed to fund various draw requests as made by Plaintiffs in accordance with the Loan Documents; and

    d.    Defendants, in concert and with regard to each Plaintiff and each Loan, refused or otherwise failed to honor certain extension terms contained in the Loan Documents, instead opting to extort extreme economic concessions from Plaintiffs.

### G. Violation of RICO, 18 U.S.C. § 1962(c)

280.    This claim arises under 18 U.S.C. § 1962(c), which provides in relevant part:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . .

281.    In violation of 18 U.S.C. § 1962(c), Defendants conducted or participated, directly or indirectly, in conducting the affairs of the Enterprise through a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5).

282.    Therefore, Defendants have violated 18 U.S.C. § 1962(c).

283.    As a result, the Plaintiffs and the other victims of the Enterprise have been injured, suffered irreparable harm, and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

284.    Plaintiffs' damages exceed $50 million and continue to accrue based upon: (a) the delay in the projects reaching completion as a result of the willful failure to fund draw requests as required by the Loan Documents; (b) the higher interest charged by Loan Services in violation of the terms of the Loan Documents; and (c) the delay associated with Defendants' refusal to grant by-right extensions. Each of these sources of damages have negatively affected the value and marketability of the Projects.

285.    In addition, because Defendants violated 18 U.S.C. § 1962(c), and absent equitable relief from the Court will continue to do so in the future, enjoining Defendants from committing future RICO violations is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes district courts to enjoin violations of 18 U.S.C. § 1962.

286.    The actions of the Enterprise, and of each Defendant acting in furtherance thereof, have caused significant monetary damage to Plaintiffs.

287.    First, millions of dollars in excess interest has been paid to Defendants by Plaintiffs due to the Defendants' refusal to honor the fixed-rate extension provisions and the prolonged timeline of the Projects. Delays in completion of the Projects were directly attributable to Defendants' funding delays – a critical aspect of their participation in the Enterprise.

288.    Payment of Defendants' excessive interest charges was drawn from other Project line items, leading to insufficient funds allocated to various aspects of the Projects .

289.    Second, the loss of material portions of 10-year tax abatements, as well as losses associated with the project-development-related abatements of 30 months, have caused significant damages in terms of both reduced value of the Projects as well as increased carrying costs.

290.    By way of example, the loss of material portions of the ten-year tax abatement for the Indiana Heights Project reduced the Indiana Heights Project's value by an estimated $4,000,000.00.

291.    Similarly, both of the Indiana Heights and Germantown Projects have been forced to expend significant sums for Philadelphia property taxes due to the expiration of the development-related tax abatements (in excess of $300,000.00 relative to Indiana Heights).

292.     Third, the forced conversion of the Germantown Project from rental apartments to condominiums (resulting in the loss of 32 units) exacerbated the liquidity crisis created by the Defendants in the course of their participation in the Enterprise.

293.     Fourth, the delays caused by the Defendants while participating in the Enterprise forced the Projects to miss target completion dates that were specifically targeted to reap the benefits of prime leasing seasons and management contracts, resulting in the loss of rental income and valuable relationships.

294.     Fifth, the Projects suffered from the increasing costs of labor and materials, both as a consequence of the stop-and-go nature of construction resulting from Defendants' actions in the course of their participation in the Enterprise, and also because of Defendants funding delays, which pushed the Projects into skyrocketing material and labor cost environments.

295.     Finally, the Defendants' refusal to fund draws in full, and Defendants' significant delays funding Plaintiffs' loan draw requests, caused irreparable harm to Plaintiffs' relationships with contractors, vendors and suppliers in the Philadelphia market.

296.     All told, Plaintiffs expect their damages to exceed $50,000,000.00.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against each of the Defendants, jointly and severally, in an amount to be determined at trial and which is presently believed to be in excess of $50,000,000.00, together with treble damages, interest, costs and reasonable attorneys' fees as provided by 18 U.S.C. § 1964, and such other relief as the Court deems just and proper, including an Order enjoining the Defendants from future participation in and perpetuation of the Loan-to-Own Scheme.

## COUNT II
### *Conspiracy to Engage in a Pattern of Racketeering Activity*
### *18 U.S.C. § 1962(d)*

297.     Plaintiffs incorporate of the foregoing paragraphs as if each were set forth at length herein.

298.     Defendants engaged in an Enterprise involved in interstate commerce; the Enterprise's activities directly affected interstate commerce.

299.     Defendants conducted or participated, either directly or indirectly, in the conduct of the affairs of the Enterprise and the Loan-to-Own Scheme through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and (d).

300.     Since at least2021, Defendants cooperated jointly and severally in the commission of two or more predicate acts that are itemized in 18 U.S.C. § 1961(A)-(B), and did so in violation of 18 U.S.C. §§ 1962(c)-(d).

301.     The Defendants participated in and/or assisted the Defendants in furtherance of the Loan-to-Own Scheme, and enabled the conspiracy and Loan-to-Own Scheme to continue, all in violation of 18 U.S.C. §§ 1962(c)-(d).

302.     The actions of the Enterprise, and each Defendant acting in furtherance thereof, have caused significant damage to Plaintiffs.

303.     Sixth, millions of dollars in excess interest has been paid to Defendants by Plaintiffs due to the Defendants' refusal to honor the fixed-rate extension provisions and the prolonged timeline of the Projects. Delays in completion of the Projects were directly attributable to Defendants' funding delays – a critical aspect of their participation in the Enterprise.

304.     Payment of Defendants' excessive interest charges was drawn from other Project line items, leading to insufficient funds allocated to various aspects of the Projects .

305.    Seventh, the loss of material portions of 10-year tax abatements, as well as losses associated with the project-development-related abatements of 30 months, have caused significant damages in terms of both reduced value of the Projects as well as increased carrying costs.

306.    By way of example, the loss of material portions of the ten-year tax abatement for the Indiana Heights Project reduced the Indiana Heights Project's value by an estimated $4,000,000.

307.    Similarly, both of the Indiana Heights and Germantown Projects have been forced to expend significant sums for Philadelphia property taxes due to the expiration of the development-related tax abatements (in excess of $300,000.00 relative to Indiana Heights).

308.    First, the forced conversion of the Germantown Project from rental apartments to condominiums (resulting in the loss of 32 units) exacerbated the liquidity crisis created by the Defendants in the course of their participation in the Enterprise.

309.    Second, the delays caused by the Defendants while participating in the Enterprise forced the Projects to miss target completion dates that were specifically targeted to reap the benefits of prime leasing seasons and management contracts, resulting in the loss of rental income and valuable relationships.

310.    Third, the Projects suffered from the increasing costs of labor and materials, both as a consequence of the stop-and-go nature of construction resulting from Defendants' actions in the course of their participation in the Enterprise, and also because of Defendants funding delays , which pushed the Projects into skyrocketing material and labor cost environments.

311.    Finally, the Defendants' refusal to fund draws in full, and Defendants' significant delays funding Plaintiffs' loan draw requests, caused irreparable harm to Plaintiffs' relationships with contractors, vendors and suppliers in the Philadelphia market.

312.    All told, Plaintiffs expect their damages to exceed $50,000,000.00.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against each of the Defendants, jointly and severally, in an amount to be determined at trial and which is presently believed to be in excess of $50,000,000.00, together with treble damages, interest, costs and reasonable attorneys' fees as provided by 18 U.S.C. § 1964, and such other relief as the Court deems just and proper, including an Order enjoining the Defendants from future participation in and perpetuation of the Loan-to-Own Scheme.

### COUNT III
*Breach of Contract*
*(Plaintiffs v. Loan Services)*

313.    Plaintiffs incorporate the foregoing paragraphs as if each were set forth at length herein.

314.    Valid and binding contracts existed between Plaintiffs and Loan Services, specifically the Loan Documents referenced herein and attached hereto (including, but not limited to, Promissory Notes, Loan Agreements, and various security instruments) governing the Germantown Loan, the Indiana Heights Loans, and the Midvale Loan.

315.    Each of the Plaintiffs negotiated specific terms for the financing they would ultimately accept from Loan Services, which financing was provided by Saluda Grade.

316.    In each instance, Plaintiffs specifically indicated the importance of ensuring that the terms of the Loans accommodated the realities of construction of the respective Projects.

317.    In each instance, Plaintiffs specifically negotiated for the inclusion of terms by which interest the rate remained stable in the event of a term extension. *See, e.g.,* Section 7.7 of the Germantown Promissory Note, the Indiana Heights Promissory Notes and the Midvale Promissory Note.

318.    Plaintiffs provided valuable consideration for these contracts, including but not limited to the payment of origination fees totaling hundreds of thousands of dollars across the Projects, the payment of monthly interest, and the conveyance of security interests in the respective Properties.

319.    At all times relevant hereto and throughout the life of the Loans, Plaintiffs performed their obligations under the terms of the Loans, or were otherwise excused from performance due to Loan Services' prior material breaches, prevention of performance and/or frustration of purpose. Specifically, Plaintiffs diligently pursued construction, submitted draw requests in accordance with the parties' course of dealing and as required by the terms of the Loans, and sought to satisfy conditions for extensions.

320.    Despite the forgoing, Loan Services materially breached the material terms of the Loan Documents at various turns.

321.    First, while the Loan Documents provide Loan Services the discretion to review draw requests, that discretion is limited.

322.    Loan Services breached its funding obligations by: (a) refusing to fund draws for work that as complete; (b) refusing to fund draws for materials (such as windows and elevators) that were purchased, delivered, and stored on-site, in direct contradiction to standard industry practice and the commercial purpose of the loans; (c) imposing pretextual and extra-contractual requirements (such as "new" invoices for items already invoiced, or "contracts" from vendors who only supply quotes) solely to delay funding; and (d) deliberately delaying the wiring of approved funds well beyond commercially reasonable timeframes, causing work stoppages.

323.    Second, Loan Services completely disregarded the original terms of the Loan Documents, which clearly entitle Plaintiffs to extensions free of interest rate increases and fees.

324.    Indeed, Section 7.7 of the respective Promissory Notes confer upon Plaintiffs a contractual right to extend the Loan's maturity date with a specific, negotiated provision that the interest rate would increase by "0.00%."

325.    Despite the foregoing, Loan Services unequivocally repudiated and breached the same, demanding interest rate increases ranging from 3.75 to 5.00 percent.

326.    Loan Services also demanded exorbitant extension fees which were not contemplated by the original agreements.

327.    In essence, Plaintiffs were completely robbed of the benefit they obtained under the original Loan Documents – Plaintiffs' hedge against rising interest rates – which benefit Plaintiffs paid for through Loan origination fees.

328.    Loan Services also materially breached the implied covenant of good faith and fair dealing, which is inherent in every contract in Pennsylvania, by exercising its discretionary powers (*e.g.*, the power to review draw requests) in a manner that was arbitrary, unreasonable, and designed to capture collateral for the Enterprise.

329.    Specific instances of Defendants' abuse of discretion include: (a) Defendants' a pattern of deliberate delay, stemming both from noncommunicative non-responsiveness and administrative delay (*e.g.*, claiming wire cutoffs were missed, staff were out sick, committees postponed, continuous employee turnover/servicing handoffs, *etc.*); (b) Defendants' refusal to process administrative reallocations of line items (such as developer fee to interest reserve when project delays forced the projects past maturity and extorted interest rates that depleted interest reserves at a quicker-than-anticipated rate) to force technical monetary defaults; and (c) Defendants' intentional withholding of capital from the various Projects in order to ensure default.

330.    Loan Services' actions have caused significant damages to Plaintiffs.

331.    First, millions of dollars in excess interest has been paid to Defendants by Plaintiffs due to the Defendants' refusal to honor the fixed-rate extension provisions and the prolonged timeline of the Projects. Delays in completion of the Projects were directly attributable to Defendants' funding delays – a critical aspect of their participation in the Enterprise.

332.    Payment of Defendants' excessive interest charges was drawn from other Project line items, leading to insufficient funds allocated to various aspects of the Projects .

333.    Second, the loss of material portions of 10-year tax abatements, as well as losses associated with the project-development-related abatements of 30 months, have caused significant damages in terms of both reduced value of the Projects as well as increased carrying costs.

334.    By way of example, the loss of material portions of the ten-year tax abatement for the Indiana Heights Project reduced the Indiana Heights Project's value by an estimated $4,000,000.

335.    Similarly, both of the Indiana Heights and Germantown Projects have been forced to expend significant sums for Philadelphia property taxes due to the expiration of the development-related tax abatements (in excess of $300,000.00 relative to Indiana Heights).

336.    Third, the forced conversion of the Germantown Project from rental apartments to condominiums (resulting in the loss of 32 units) exacerbated the liquidity crisis created by the Defendants in the course of their participation in the Enterprise.

337.    Fourth, the delays caused by the Defendants while participating in the Enterprise forced the Projects to miss target completion dates that were specifically targeted to reap the benefits of prime leasing seasons and management contracts, resulting in the loss of rental income and valuable relationships.

338.    Fifth, the Projects suffered from the increasing costs of labor and materials, both as a consequence of the stop-and-go nature of construction resulting from Defendants' actions in the course of their participation in the Enterprise, and also because of Defendants funding delays, which pushed the Projects into skyrocketing material and labor cost environments.

339.    Finally, the Defendants' refusal to fund draws in full, and Defendants' significant delays funding Plaintiffs' loan draw requests, caused irreparable harm to Plaintiffs' relationships with contractors, vendors and suppliers in the Philadelphia market.

340.    All told, Plaintiffs expect their damages to exceed $50,000,000.00.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Loan Services in an amount to be determined at trial and which is presently believed to be in excess of $50,000,000.00, along with pre and post-judgment interest and costs.

*Respectfully submitted,*

**SILVERANG, ROSENZWEIG
& HALTZMAN, LLC**

**By:**    /s/ Philip S. Rosenzweig
Philip S. Rosenzweig, Esquire
Kevin D. McGowan, Jr., Esquire
Briana S. Bryant, Esquire
PA Atty ID Nos. 62461 / 324196 / 334992
Woodlands Center
900 E. 8th Ave., Suite 300
King of Prussia, PA 19406
(610) 263-0115
*Attorneys for Plaintiffs,*
*Midvale Commons, LLC, Trolley Car*
*Development, L.P., Indiana Heights, LLC,*
*and Plymouth Square Associates I*

4915-2846-0152, v. 10