## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MIDVALE COMMONS, LLC,** *ET AL.*, <br>      *PLAINTIFFS*, <br><br>    **v.** <br><br> **CONSTRUCTION LOAN SERVICES II, LLC** D/B/A OR A/K/A **BUILDERS CAPITAL,** *ET AL.*, <br><br>      *DEFENDANTS*. | **Civil Action Arising Under 18 U.S.C. § 1962,** *et seq.* <br> (Racketeer Influenced and Corrupt Organizations (RICO) Act) <br><br><br> **CASE NO.** 2:26-cv-00128-HB |

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Plaintiffs, Midvale Commons, LLC ("**Midvale**"), Trolley Car Development, L.P. ("**Trolley Car**"), Indiana Heights, LLC ("**Indiana Heights**"), and Plymouth Square Associates I ("**Plymouth Square**" or, together with Indiana Heights, Trolley Car, and Midvale, "**Plaintiffs**" or "**Borrowers**"), by and through their undersigned counsel, respectfully submit the instant memorandum of law in opposition to the Motion to Dismiss (ECF 32, the "**Motion**") filed by Defendants Saluda Grade Holdings, LLC ("**Saluda Holdings**"), Saluda Grade Asset Management, LLC ("**Saluda Management**," or, together with Saluda Holdings, "**Saluda Grade**"), Construction Loan Services II, LLC d/b/a or a/k/a Builders Capital ("**Loan Services**" or "**Lender**"), Valerie Moses, Bill Finzer, Lynda Rodriguez, David Schultz, Michele Howe and Curt Altig (collectively, Saluda Grade, Loan Services, Moses, Finzer, Schultz, Howe and Altig are "**Defendants**"), in the above-captioned matter. For the reasons set forth herein, *infra*, Plaintiffs respectfully request the Motion be denied in its entirety.

### I.
### INTRODUCTION

The FAC, supported by 48 separately identified exhibits, alleges a coordinated "loan-to-own" scheme whereby Loan Services, funded and directed by its securitization partner, Saluda

Grade, induced Plaintiffs to borrow approximately $85 million by pledging, in writing and in conversations, two protections that Plaintiffs expressly required and bargained for as material inducements to entering into the loan facilities: (a) a by-right maturity extension with a 0.00% interest rate increase and no fee for the first extension (Promissory Notes[1] §§ 7.6, 7.7), and (b) the condition that draw funding would be administered against receipted invoices and inspection-supported percentage-of-completion determinations (Promissory Notes §§ 5.1, 5.3). The FAC further alleges that Defendants had no intention of honoring their promises and contractual obligations at the time they were made; these allegations are based upon Defendants' efforts to deliberately starve the Projects of capital, through pretextual, undocumented or grossly under-documented draw denials, and fabricated delay. The FAC alleges a pattern of conduct so repetitive and consistent as to infer an intentional, coordinated scheme, as opposed to Defendants' gross negligence or incompetence.

This FAC detailed conduct enabled Defendants to wield the pretextual threat of maturity defaults, creating a false basis for their refusal to honor Plaintiffs' by-right extensions. Defendants used the resulting manufactured crisis to extract rate hikes and fees that were contrary to the Parties' express agreements, and crafted ***self-exonerating releases of Loan Services' illicit conduct as a result of the manufacturing of the maturity defaults***. Following execution of the releases, Defendants escalated this conduct, until the Germantown Project collapsed in 2025.

Against this factual narrative, Defendants raise four separate arguments, each as unavailing as the last at the pleading stage. As a preliminary matter, Defendants' Motion refuses to engage the facts as pleaded in the FAC and, instead, relies on a contrary, highly sanitized version of the facts wherein Defendants merely "administer[ed] real estate development loans" and "insist[ed] on strict

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Plaintiffs' First Amended Complaint (ECF 30, the "**FAC**").

compliance" with the Parties'[2] purported bargain. This re-framed factual narrative is not what the FAC *actually* alleges, and on a Rule 12(b)(6) motion to dismiss, it is the FAC's allegations, not Defendants' interpretive retelling thereof, that controls. Ultimately, while Defendants' Motion masquerades as a Rule 12(b)(6) motion to dismiss, it, instead, requires the Court to credit their alternative version of disputed facts, to accept and resolve fact-bound affirmative defenses on the pleadings, and to ignore controlling precedent in the Third Circuit. Accordingly, the Motion should be denied in its entirety.

## II.
## COUNTERSTATEMENT OF FACTS[3]

Each of the Plaintiffs is a Pennsylvania real-estate development entity associated with a different, discrete development project that, at different times between January and March 2022, closed on four separate, distinct construction loans with Loan Services to fund the construction of the Midvale, Germantown, and Indiana Heights Projects in Philadelphia, Pennsylvania, respectively. [FAC ¶¶ 41-56]. The capital underlying the Loans came from, and the Loan structures were apparently dictated by, Loan Services' securitization partner, Saluda Grade. [FAC ¶¶ 57-62, 105-109].

During the underwriting process,[4] Plaintiffs repeatedly stressed to Loan Services that they had two specific loan needs: (a) terms that were long enough to complete the Projects *in toto*, and (b) protection against interest-rate increases if a maturity extension became necessary.

---

[2] Plaintiffs and Defendants are collectively referenced as the "**Parties**" herein.

[3] Plaintiffs provide the instant brief recitation of operative facts for the convenience of the Court only, and do not intend such recitation to be exhaustive. Plaintiffs expressly rely upon and incorporate the factual recitation set forth in the FAC, which is significantly specific and legally sufficient to defeat Defendants' Motion.

[4] Defendants' factual recitation misunderstands Plaintiffs' position regarding each Plaintiff's historical knowledge of Saluda Grade's involvement. Contrary to Defendants' misapprehension, Plaintiffs were keenly aware that Saluda Grade was involved in the underwriting process. Plaintiffs contend that they were unaware that Saluda Grade's involvement extended *beyond the underwriting and provisioning of capital to daily involvement with review and disapproval of Plaintiffs' legitimate draw requests*.

[FAC ¶¶ 64-67, 107-109, 211-214, 253]. Those needs were specifically memorialized and referenced in the Loan Documents. Section 7.7 of each Promissory Note provides that, upon maturity extension, "the Note Rate for the Loan shall increase … to a rate per annum equal to 0.00% above the original Note Rate." [FAC ¶ 68]. Section 7.6 of the Promissory Notes provides that "no extension fee shall be due or payable in connection with the first extension period." [FAC ¶ 69]. Plaintiffs executed the Promissory Notes with the reasonable expectation that Defendants would adhere to the terms contained therein that were the product of negotiation by and between the Parties.

Furthermore, sections 5.1 and 5.3 of the Promissory Notes obligated Loan Services to fund draws upon submission of Draw Affidavits, and constrained its determination of allowed amounts to the review of receipted invoices, inspection-supported percentage-of-completion statements, or a schedule of values. [FAC ¶¶ 72–73, 88–89]. The November 19, 2021 letter of intent for Germantown offered a 30-month term with two extensions; when presented to Saluda Grade, Saluda Grade "balked" and compressed the term to 24 months, then papered over the difference with by-right extensions Defendants never intended to honor the terms of the Promissory Notes. [FAC ¶¶ 110–119]. For Indiana Heights, Loan Services executives represented the compressed 24-month term "was a formality and that extensions would be granted," and that Loan Services "was focused on supporting developers, promptly funding draws, and avoiding foreclosure except in extreme cases." [FAC ¶¶ 211–218]. To the extreme detriment of Plaintiffs, the foregoing documented protections were illusory from the start.

The FAC specifically alleges that the administration of the draw process was "deliberately haphazard, disorganized, and inherently inefficient," as it routed inspections through layers of out-of-state subcontractors who routinely arrived on-site to evaluate percentage-of-completion and the

in-place improvements without proper information. These third-party subcontractors often lacked any information from the draw package or, even worse, arrived "with inaccurate information" supplied by Defendants. [FAC ¶¶ 76-85]. In this way, Defendants contorted their rights and abused their discretion to approve draw requests under the Promissory Notes by ignoring their obligation to both act reasonably to evaluate each draw request and to approve properly documented draw requests. The FAC catalogs dozens of partial denials in which Loan Services withheld funds for completed work and on-site materials on stated grounds that were demonstrably pretextual, *e.g.*, "no clear invoice" for insurance costs that had been invoiced, "after wire cutoff" for an already-approved draw; "0% Complete – no work has been completed" for deposits required to start the very same work referenced, and "availability based on line item completion" completely untethered to any actual inspection data (obviously exacerbated by the fact that the inspection protocol was deliberately cumbersome, unreliable, and unfaithful to the conditions as they actually existed at the Projects). [FAC ¶¶ 120-185, 220-241, 257-265]. Tellingly, Loan Services "never provided documentation" contemporaneously to substantiate these reductions. *Id.* This practice of constant full and partial denials of legitimate, documented draw requests was the first stage of Defendants' "loan-to-own" scheme.

As each Loan approached its respective initial maturity date, Loan Services, on behalf of Defendants, engaged in the second stage of the "loan-to-own" scheme. The second stage was the refusal of Plaintiffs' by-right extension, a right included in each Loan's documentation. Instead of honoring the by-right extension provisions for each Loan, Defendants illicitly demanded rate increases of 3.75% to 5.00%, along with extension fees for such extensions contrary to the agreed to terms. In fact, these demands violate Sections 7.6 and 7.7 of the Promissory Notes. Plaintiffs

believe, and the FAC alleges, that it was always Defendants' intent to disregard Plaintiffs' specifically enumerated contractual rights under the loan documents.

Even more alarmingly, and reflecting Defendants' knowledge that their draw request denials and extension refusals were patently actionable, Loan Services also included an astounding, self-serving release of "all preceding conduct." [FAC ¶¶ 119, 197-200, 227-229, 266-269] in each such extension document. Plaintiffs relied upon Defendants' promise of by-right extensions for years. At this point, under severe duress from the tens of millions of dollars already invested, the continual accrual of interest, and the lack of available alternative completion financing, each Plaintiff signed the extension terms – including the release – in an effort to mitigate their respective damages. Midvale executed the extension terms on August 1, 2023, Trolley Car on March 13, 2024, and Indiana Heights on March 19, 2024. [FAC ¶¶ 285-289]. Of note, the releases **only** relate to claims of which the Borrowers had "**knowledge as of the date**" of each respective agreement. [FAC ¶ 290 (emphasis added)].

The FAC expressly alleges that Plaintiffs could not have known that Saluda Grade was directing Loan Services' day-to-day funding decisions, that the same scheme was being employed against many other borrowers in the market place, and that Loan Services' "Special Assets" group was a coordinated maturity-default mechanism rather than an ordinary loan servicer. [FAC ¶¶ 25-27, 291-294]. Indeed, the first written disclosure of Saluda Grade's daily operational role came on July 18, 2025, when Defendant Altig admitted, "Saluda Grade is involved with our team daily on th[is]"—an admission that post-dates every release relied upon by the Motion. [FAC ¶¶ 24, 292].

The Motion attempts to downplay this important point, by arguing that Plaintiffs were aware of Saluda Grade's involvement from the start insofar as Saluda Grade had specific securitization requirements relative to the Loans. [Mot. p. 12]. This recitation completely

misconstrues the allegations of the FAC—Plaintiffs do not allege that they were "unaware that Saluda was the underwriter of the loans," but rather that they were unaware before 2025 that Saluda Grade was involved in the day to day administration and/or Loan servicing decisions. *Id.*

The FAC further alleges that the duress exerted upon Plaintiffs by Defendants never abated, and that Defendants' misconduct escalated after the effective date of the backward-looking releases. Trolley Car endured a cascade of post-amendment denials — including the May 9, 2025 reduction of a $10,148,519.10 draw request to a mere $431,318.74 — culminating in the August 8, 2025 shutdown of the Germantown Project and Defendant Schultz's August 22, 2025 declaration of maturity default. [FAC ¶¶ 141–185]. Indiana Heights suffered continued pretextual denials, forfeited a 10-year tax abatement (reducing Project value by an estimated $4 million), lost a national management contract, and was handed a punitive September 9, 2025 forbearance proposal. [FAC ¶¶ 234–249]. Midvale was driven into a December 2024 default declaration, despite substantial completion of its building. [FAC ¶¶ 257–270].

### III.
### LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the legal sufficiency of the complaint. *Brzozowski v. Pa. Tpk. Comm'n*, 165 F. Supp. 3d 251, 258 (E.D. Pa. 2016)(citing *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the plaintiff is entitled to relief."" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests."" *Malibu Media, LLC v. Doe*, 238 F. Supp. 3d 638, 642-643 (E.D. Pa. 2017)(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Pleading standards in federal actions require a plaintiff to allege facts sufficient to show that the plaintiff has a "plausible claim for relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009)(relying on *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 679). A facially plausible claim must allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Iqbal*, 556 U.S. at 678). Plausibility "does not impose a probability requirement[;]" a well-pleaded complaint may proceed "even if it strikes a savvy judge that actual proof of those facts is improbable[.]" *Twombly*, 550 U.S. at 556.

When presented with a motion to dismiss for failure to state a claim under Rule 12(b)(6), district courts should conduct a two-part analysis. *Fowler*, 578 F.3d at 210. First, the court must separate the factual and legal elements of the claim. *Id*. Second, the court must determine whether the facts alleged in the complaint demonstrate that the plaintiff has a "plausible claim for relief." *Id*. (citing *Iqbal*, 556 U.S. at 678). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. Of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

**IV.**
**ARGUMENT SUMMARY**

Two principles defeat much of Defendants' Motion at the threshold. First, the Court may not weigh competing inferences or resolve factual disputes in the Motion now before it. Where the facts permit both an innocent and a culpable inference, the plaintiff receives the benefit of inference/doubt. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790–91 (3d Cir. 2016)("Although a reviewing court now affirmatively disregards a pleading's legal conclusions, it must still — as we have already emphasized — assume all remaining factual allegations to be true, construe those

truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them.").

Second, an affirmative defense, such as release, cannot support dismissal where it "is not apparent on the face of the complaint[.]" *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014); *accord Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997)(*quoting Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)); *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 n.10 (3d Cir. 1978)("[T]he predicate establishing the [affirmative] defense [must be] apparent from the face of the complaint.). That is so notwithstanding the limited scope, backward looking nature of the purported releases in the first place.

## V.
## ARGUMENT

**A. *The Releases Do Not Bar Plaintiffs' Claims and Cannot be Resolved on a Rule 12(b)(6) Motion to Dismiss***

Under the Federal Rules of Civil Procedure, the operation of a release is considered an affirmative defense. Fed. R. Civ. P. 8(c). As such, an asserted release warrants dismissal of a claim *only if its validity and scope are "apparent on the face"* of the FAC. *Schmidt*, 770 F.3d at 249. "'[I]f the bar is not apparent on the face of the complaint, then it may not afford the basis for dismissal of the complaint under Rule 12(b)(6).'" *Id.* (citations omitted).

Here, the FAC affirmatively pleads facts disputing both the scope and the validity of the releases asserted by Defendants relative to each Loan extension. Defendants' argument based upon *Dorenzo v. Gen. Motors Corp.*, 334 F. Supp. 1155, 1156 (E.D. Pa. 1971) implicitly embraces the foregoing in that the Court in *Dorenzo* stated that "[a] release […] can only be set aside as any contract, even the most solid contract or deed can be set aside, in the presence of clear, precise, and indubitable evidence of fraud, accidental means, or incompetence." (*citing Mannke v.*

*Benjamin Moore & Co.*, 375 F.2d 281, 285 (3d Cir. 1967)). The foregoing is, quite obviously, an inherently factual inquiry that cannot be disposed of on a Rule 12(b)(6) motion in light of the facts set forth in the FAC and the reasonable inferences which must be drawn therefrom in favor of Plaintiffs.

### 1. The Releases Do Not Apply to the Concealed "Loan-to-Own" Scheme

The releases are neither prospective nor general. By their terms, each release discharges *only* claims each of the Borrowers "ha[d] knowledge of as of the date of" the release. [FAC ¶ 290]. A release executed on the basis of limited knowledge cannot, by its plain language, bar claims of which the releasing party could not have been aware. Plaintiffs were *generally* aware of the procedure of Loan underwriting by Loan Services' capitalization partner, Saluda Grade. But the FAC specifically alleges that, at the signing of the releases, the funding-related friction between the Parties reflected "good-faith disagreements about project progress and ordinary draw oversight;" and that Plaintiffs ***could not have known that Saluda Grade was directing funding decisions (thus invalid funding denials) daily***, that the pattern spanned a multitude of borrowers, or that "Special Assets" division functioned as or existed to carry out Defendants' intentional, collective, default-extortion mechanism. [FAC ¶¶ 25-27, 291-294]. Indeed, the FAC pleads that these facts were not revealed to Plaintiffs until *after* the releases were executed on July 18, 2025. [FAC ¶¶ 24, 292]. Ultimately, whether the FAC's claims were within Plaintiffs' "knowledge" at the time the release agreements were signed is fundamentally a fact-intensive inquiry. Therefore, it cannot be resolved by the Court on a Rule 12(b)(6) motion.

Plaintiffs allege that the loan terms were "negotiated and agreed to among" Plaintiffs. But Loan Services and Saluda Grade ask the Court to unreasonably infer from this allegation that Plaintiffs knew Saluda Grade was covertly orchestrating pretextual draw denials in order to

manufacture defaults. While Plaintiffs knew Saluda Grade was an underwriter and capital partner to Loan Services, this fact simply does not establish Plaintiffs' knowledge that Saluda Grade was dictating or otherwise issuing illicit and contract contrary decisions relative to Plaintiffs' draw requests. Because Plaintiffs were unaware at the time of execution of the releases that Saluda Grade was pretextually denying legitimate draw requests and manufacturing Loan defaults, Plaintiffs could not have discharged claims based upon Saluda Grade's malfeasance. Therefore, the releases do not affect Defendants' liability to Plaintiffs for perpetuation of the "loan-to-own" scheme against them.

### 2.  A Substantial Part of the Challenged Conduct Post-Dates the Releases

Each release affects only "actions, events or occurrences prior to the date of this Agreement." [FAC ¶ 290]. Much of the conduct underlying both the RICO based and contract based claims occurred ***after the operative release dates*** (Midvale 8/1/2023; Trolley Car 3/13/2024; Indiana Heights 3/19/2024). The FAC pleads numerous post-release predicate acts and breaches: (a) the June 6, 2024, December 2024, January 30, 2025, and May 9, 2025 Germantown denials; (b) the August 2025 shutdown and default declaration; (c) the October 29, 2024 and January 23, 2025 Indiana Heights denials; (d) the September 9, 2025 punitive forbearance proposal; and (e) the 2024 Midvale default declaration. [FAC ¶¶ 28, 141-185, 234-249, 257-270]. Each of these acts was committed after the releases were executed, and therefore cannot have been released by the Plaintiffs. At a minimum, Plaintiffs' pleaded post-release conduct states valid claims and the Motion cannot be granted on that basis.

### 3.  The FAC Pleads Economic Duress Involving a Wrongful Act

In a bold and impermissible attempt to recast Plaintiffs' pleaded narrative in a light more favorable to their Motion, Defendants argue that "financial pressure, hard bargaining, or threatened

exercise of contractual rights" cannot constitute duress. The liberties taken by Defendants with respect to the FAC's pled facts render this anemic argument inapplicable. Tellingly, Defendants do not cite a single binding Pennsylvania or Third Circuit decision in support of the proposition that a lender's demands cannot constitute duress. The authorities they do invoke—*Carrier v. William Penn Broadcasting Co.*, 233 A.2d 519 (Pa. 1967); *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885 (3d Cir. 1975); and *Degenhardt v. Dillon Co.*, 669 A.2d 946 (Pa. 1996)— are distinguishable because none of those cases involve lenders.

To fill this void, Defendants reach for the Second Circuit's application of New York law in *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136 (2d Cir. 2011). But in point of fact, *Interpharm* undermines Defendants' arguments. There, the Court held that "a threat to withhold performance that one is contractually obligated to provide in order to compel the other party to submit to new demands can constitute a wrongful threat." *Interpharm*, 655 F.3d at 142–43. Ultimately, the Court in *Interpharm* declined to find duress because the borrower had already defaulted, so the lender "was under no obligation to extend any further credit" and was merely exercising its remedies. *Id*. at 148. Therefore, said New York law based decision does not support Defendants' argument at all.

The FAC *sub judice* alleges the opposite sequence. Loan Services was contractually obligated to process substantiated draw requests as submitted (Promissory Notes §§ 5.1, 5.3) and to grant the by-right extensions at a 0.00% rate increase with no fee for the first extension (Promissory Notes §§ 7.6, 7.7). In complete disregard of those obligations, and at the direction of Saluda Grade (through Loan Services' "Special Assets" group), Defendants withheld that contractually required performance as leverage to extract rate hikes, fees and releases, thereby manufacturing the very "default" they later declared. [FAC ¶¶ 295–296]. Defendants issued

precisely the wrongful threat *Interpharm* prohibits. *See also, Litten v. Jonathan Logan, Inc.*, 286 A.2d 913, 917–18 (Pa. Super. 1971) (economic duress voids an agreement where the defendant itself created the "inextricable financial crisis" that left the plaintiff with "no alternative but to sign the contract as written"). Thus, even Defendants' selected non-binding extra-judicial authority supports Plaintiffs' allegations that Defendants made wrongful threats to enrich themselves.

Under applicable Pennsylvania law, where a defendant "maneuvered plaintiffs into an untenable economic crisis from which they could extricate themselves only by signing," the resulting agreement is voidable for economic duress. In *Degenhardt v. Dillon Co.*, 669 A.2d 946 (Pa. 1996), the Pennsylvania Supreme Court reaffirmed the rule of *Carrier v. William Penn Broadcasting Co.*, 233 A.2d 519 (Pa. 1967), that, absent threats of bodily harm, "a party who has a reasonable opportunity to consult with legal counsel before entering into a contract cannot later invalidate the contract by claiming economic duress." *Degenhardt*, 669 A.2d at 950. There, a contractor sought to void an assignment agreement and release he signed under threat from his development partner of withdrawal from the project unless he assigned his interest. The Court directed entry of judgment notwithstanding the verdict for the partner, holding that the contractor could not establish duress. *Id*. at 950–51.

*Degenhardt* does not control here, for two reasons the Court itself supplied. First, the duress claim in *Degenhardt* failed because the defendant "in no way contributed to, much less caused, [the plaintiff's] financial difficulties," which "existed independently of the development project at issue." *Id*. at 952 n.5. In so holding, the Court held where the *defendant* places the plaintiff in an "inextricable financial crisis," the cases barring a claim based in duress in instances where said party may consult counsel "are not here applicable," because counsel's advice "could not have assisted" the plaintiff. *Id*. at 952 n.5 (discussing *Litten*, 286 A.2d 913). The FAC's allegations fall

directly into this category: "Each release was signed under economic duress that Defendants themselves manufactured" through Defendants' "pre-amendment breaches of the original Loan Documents." [FAC ¶ 295-96]. Thus the FAC asserts that *Plaintiffs* caused Defendants' duress, a fact pattern constituting duress under *Degenhardt.*

Second, the threat in *Degenhardt* was a threat to exercise a legal right to withdraw from a development project, whereas the FAC alleges that Defendants illegally threatened to withhold performance they were contractually obligated to render. Finally, *Degenhardt* was resolved on a full trial record by judgment notwithstanding the verdict, underscoring that the existence of duress is a fact-intensive question ill-suited to resolution on a Rule 12(b)(6) motion. Moreover, whether Plaintiffs had a reasonable alternative in light of the vast sunk costs, substantial accruing interest, and the absence of available alternative completion financing as the FAC alleges is a fact question inappropriate to consider under the Rule 12(b)(6) standard.

### 4.   The Releases are Voidable Because they were Fraudulently Procured

"[E]ach release was procured by Defendants' continuing concealment of their scheme." [FAC ¶ 294]. Defendants rely on, *Dorenzo v. General Motors Corp.*, 334 F. Supp. 1155 (E.D. Pa. 1971), a case which actually confirms that their release defense cannot be resolved against Plaintiffs here. In *Dorenzo*, the plaintiff signed a broad general release discharging the named parties "and "all other persons, firms and corporations" from "all claims … of any kind" in the presence of counsel and for paid consideration, and then sued an unnamed manufacturer. *Id*. at 1156. The court enforced the release on summary judgment, but for a reason that is dispositive here: the plaintiff "never denied the validity of said release in any document filed with th[e] Court," and raised only an unrelated joint-tortfeasor theory. *Id*. at 1156–57. The court specifically distinguished the *Dorenzo* fact pattern from the facts adduced in the case at bar: "If, in the instant

case, plaintiff had averred that the release was not valid a question of fact would exist which would require a denial of defendant's motion." *Id*. at 1157.

Of course, Plaintiffs do aver at length in the FAC that the releases are invalid and inapplicable, that they were procured by Defendants' fraudulent concealment of the "loan-to-own" scheme, that they were signed under Defendants' manufactured economic duress, and that they are limited by their own terms only to legal claims known to the Plaintiffs at the time of signing. [FAC ¶¶ 25-28, 290-96]. These averments require denial of the Motion. *Dorenzo*, 334 F. Supp at 1157. The standard Defendants invoke, that a release may be set aside upon "clear, precise, and indubitable evidence of fraud, accidental means or incompetence," *id*. at 1156 (quoting *Mannke v. Benjamin Moore & Co.*, 375 F.2d 281, 285 (3d Cir. 1967)), is an evidentiary standard governing proof at trial, not a pleading hurdle. Indeed, the standard presupposes a factual record – which is not yet present in this case – and cannot defeat well-pleaded allegations on a Rule 12(b)(6) motion. In all events, the *Dorenzo* release was an unconditional general release of "all claims … of any kind." The releases here are materially narrower, pertaining to Loan Services only and reaching only claims within Plaintiffs' knowledge as of signing by the releases' own express terms. As such, the releases were procured by fraud and are therefore voidable.

### 5. Ratification and "Acceptance of Benefits" are Premature and Inapplicable

Defendants argue that Plaintiffs ratified the releases by continuing to draw funds. Ignoring the fact that Plaintiffs were obligated to mitigate their damages by attempting to complete the Projects, which required the proceeds promised by Defendants (and for which Defendants were contractually obligated), ratification is inapplicable here. The FAC specifically alleges that the duress did not cease after signing the extensions such that ratification could take effect; instead, the economic duress imposed by Defendants' conduct intensified through Defendants' continued,

escalating funding (lack of funding of draws) abuses. [FAC ¶¶ 295-296]. Plaintiffs could not have ratified Defendants' conduct when the very coercion that vitiated their assent remained. Nor was the drawing of funds to which Plaintiffs were **already contractually entitled** under the original Loan Documents "inconsistent with disaffirmance" of the releases. In all events, whether Plaintiffs acted voluntarily and free of duress is a fact-intensive inquiry ill-suited to a motion to dismiss — as confirmed by the fact that Defendants' own ratification authority was resolved only on a developed summary-judgment record. *See Universal Atl. Sys., Inc. v. Honeywell Int'l, Inc.*, 388 F. Supp. 3d 417, 432 (E.D. Pa. 2019); *see also Nat'l Auto Brokers Corp. v. Aleeda Dev. Corp.*, 364 A.2d 470, 476 (Pa. Super. 1976) (recognizing, upon complete discovery, that acceptance of benefits may ratify a contract entered under duress).

Defendants' theory also inverts the law by recasting Plaintiffs' mitigation efforts as a waiver of their claims. Driven to the brink by Defendants' funding abuses, Plaintiffs were required to take reasonable steps to avoid aggravating their losses. These steps included attempting to move the Projects forward and drawing the funds necessary to do so. "The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party." *S.J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 530 (3d Cir. 1978) (applying Pennsylvania law and quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198–99 (3d Cir. 1950)). Defendants cannot manufacture a "ratification" out of conduct that their own breaches compelled. Thus, the Motion cannot be granted on Defendants' premature and inapplicable assertions of ratification and acceptance of benefits.

### B. *The FAC States a Claim Under RICO*

#### 1. The Association-in-Fact Enterprise

An association-in-fact enterprise requires only "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). It "need not have a hierarchical structure," a name, or formal rules. *Id*. at 948. The FAC pleads each element: a common purpose (the "loan-to-own" scheme to profit through manufactured maturity defaults and foreclosure); defined (if initially obscured to Plaintiffs) relationships (Saluda Grade as capital source and director of funding decisions, Loan Services as originator/servicer, and six named "Special-Assets" personnel executing the day-to-day denials and delays); and longevity (a multi-year, multi-borrower pattern). [FAC ¶¶ 5–9, 271–296].

Defendants' ordinary business relationship cases (*e.g., Brittingham v. Mobil Corp.*, 943 F.2d 297 (3d Cir. 1991)) are inapposite because the FAC alleges conduct outside ordinary lending business practices. Most pointedly, Defendant Altig admitted that "Saluda is involved with our team daily" in funding decisions. [FAC ¶¶ 24, 292]. A warehouse lender's daily direction of a servicer's individual draw determination, in service of an alleged scheme to manufacture defaults, is not the "normal" arms-length lender-borrower business relationship contemplated in caselaw. Whether the relationships were innocent or culpable is, again, an inference owed to Plaintiffs at this stage. *Connelly*, 809 F.3d at 790–91. Distinctness presents no obstacle: under § 1962(c), an association-in-fact comprised of multiple defendants is distinct from each defendant-person. As such, the FAC sufficiently pleads an association-in-fact enterprise under RICO.

### 2. The Pattern

A pattern requires at least two related predicate acts posing a threat of continued activity. 18 U.S.C. § 1961(5); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The FAC pleads relatedness (each act furthered the single loan-to-own scheme), continuity (years of conduct across

four loans and multiple borrowers, ongoing), and the predicate acts themselves. [FAC ¶¶ 277–296]. Thus, the FAC sufficiently alleges Defendants' pattern under RICO.

### 3. The Predicate Acts

Rule 9(b) requires specifics of the fraud to be set forth. The FAC delivers exactly what Rule 9(b) requires, cataloging approximately twenty discrete wire transmissions — each identified by date, sender, recipient, content, and the reason it was false or pretextual. [FAC ¶¶ 278–281]. These include, among others: the November 19, 2021 letter of intent transmitting terms Defendants did not intend to honor; the executed Notes transmitting the § 7.7 and §§ 5.1/5.3 terms as present-fact representations Defendants did not intend to perform; the May 1, 2023 false "after wire cutoff" explanation; the December 2023–March 2024 "non-negotiable" UCC demand found nowhere in the Loan Documents; the June 6, 2024, January 30, 2025, and May 9, 2025 pretextual partial-approval notices; the February 2025 demands for "executed contracts" to support invoices Loan Services itself had requested; Schultz's August 2025 "committee" and default communications; and Altig's July 18, 2025 concealment admission. *Id*. This is the opposite of the "threadbare" pleading Defendants describe and wish it to be so.

Defendants' contention that none of these communications was "false" misreads both the FAC and the law. A statement of a present intention to perform, made with no intention of performing, is actionable fraud. *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 217–18 (3d Cir. 2022) ("a promise without an intention to perform may form the basis of a fraud claim"). And many of the pleaded acts are not promises at all, but affirmative misstatements of existing fact. For example, Defendants represented that a draw was delayed because an inspection arrived "after wire cutoff," that insurance lacked a "clear invoice" when it had been invoiced, or that a UCC filing was a contractual "requirement." Whether those statements were pretextual is a fact question,

and the FAC plausibly alleges that they were. Further noted is that to the extent some details lie uniquely within Defendants' books and records, Rule 9(b) is relaxed. *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002).

Defendants argue the Loan Agreements' integration clauses bar any fraud premised on representations. The Third Circuit squarely rejected that argument in *SodexoMAGIC*. In *SodexoMAGIC, LLC*, 24 F.4th 183, the Third Circuit, applying Pennsylvania law, reversed summary judgment denying a fraud claim, and clarified the precise limits of the two doctrines Defendants invoke here. There, a food-services vendor alleged that Drexel University fraudulently induced it to enter a multi-year contract by misrepresenting and concealing its true student-enrollment projections. *Id*. at 199–201. Under *SodexoMAGIC*'s holding, a standard integration clause does not trigger the parol evidence rule's bar on fraudulent-inducement claims. Such claims are barred only where the contract contains a "fraud-insulating" provision, such as a no-reliance clause or a clause disclaiming or superseding prior representations. *Id*. at 213–16. Because the Drexel contract's merger clause did not disclaim reliance on prior representations, it did not bar the plaintiff's fraud claim. *Id*. at 215–16.

The *SodexoMAGIC* Court further determined that the gist of the action doctrine does not bar a fraud claim grounded in the "precontractual duty not to deceive through misrepresentation or concealment," which "exists independently of a later-created contract" and "would exist with or without" the contract. *Id*. at 216–17. The Court also found no requirement that a defrauded party rescind an agreement to preserve its claim: "Pennsylvania law is not so unkind to the defrauded," and a party "can affirm a contract over a period of time without waiving a claim to fraudulent inducement." *Id*. at 212. And, finally, the *SodexoMAGIC* Court held that a promise or projection made with no present intention of performing is actionable fraud; false "future projections" qualify

as "a misrepresentation of an existing fact," and a speaker whose current representation later becomes false has a duty not to conceal that change. *Id*. at 211–12, 217–18.

The core fraud representations here are not extrinsic oral statements contradicting the writing; they are embedded in and constitute the written terms themselves (Promissory Notes §§ 7.6, 7.7, 5.1, 5.3), alleged to have been made with no intent to perform, the precise promissory-fraud theory *SodexoMAGIC* sustained. And the numerous post-contract misstatements during loan administration are wholly outside the reach of any integration clause. Therefore, Defendants' arguments are flatly wrong.

The FAC's fraud allegations satisfy the aforementioned *SodexoMAGIC* standard. Defendants' bait-and-switch inducement occurred before any binding contract existed; the duty Defendants breached there "was grounded only in tort." *SodexoMAGIC*, 24 F.4th at 216. And the post-contract misstatements (false "wire cutoff," fabricated documentation "requirements," pretextual "completion" denials) breach the Defendants' social duty prohibiting deceit, not merely their promise to fund. At a minimum, the gist inquiry is "fact-intensive" and generally unsuited to resolution on the pleadings where, as here, deception independent of the contract is plausibly alleged. Defendants' contrary authorities (*Kolar; Sunlight Electric*) turn on the absence of any deception, a conclusion that cannot be made at this stage of the case at bar based on the FAC's well-pleaded facts and the inferences in favor of Plaintiffs that must be drawn therefrom.

Defendants' argument concerning extortion under the Hobbs Act, 18 U.S.C. § 1951, is similarly unavailing. Defendants purport to invoke the rule that economic fear is wrongful "only when the alleged extortionist has no lawful claim to the property." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 523 (3d Cir. 1998). However, Plaintiffs allege extortion as a RICO predicate that reaches "the obtaining of property from another, with his consent, induced by

wrongful use of … fear," including the fear of economic loss. The Third Circuit's governing framework for such claims originates in *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998), the very case on which Defendants principally rely. There, the court held that the use of economic fear is "wrongful" only where "the alleged extortionist has no lawful claim to th[e] property" obtained. *Id*. at 522 (*quoting United States v. Enmons*, 410 U.S. 396, 400 (1973)). To separate extortion from lawful "hard bargaining," the court distinguished a hard-bargaining scenario where "the alleged victim has no pre-existing right to pursue his business interests free of the fear he is quelling," from an extortion scenario where "the alleged victim has a pre-existing entitlement to pursue his business interests free of [that] fear." *Id*. at 525. In other words, the question is whether the defendant exploited economic fear "to obtain property to which the exploiter is not entitled." *Id*. at 523–24.

Read in Plaintiffs' favor, the FAC alleges extortion under that very framework, and *Brokerage Concepts* is distinguishable. The extortion claim there failed for a single reason: the victim pharmacy had no pre-existing right to membership in the HMO's network, so the HMO "could have denied [it] access … for any reason, or for no reason at all" and could lawfully exchange that access for the disputed business. *Id*. at 526. The court was explicit that the result would differ where the victim holds a pre-existing entitlement to whatever is threatened. *Id*. at 525–26. Plaintiffs held exactly such entitlements to the loan proceeds. The FAC pleads that Plaintiffs had contractual rights to a by-right maturity extension at a 0.00% rate increase (Promissory Notes § 7.7), a first extension free of any fee (§ 7.6), and the funding of substantiated draw requests (§§ 5.1, 5.3) – all of which Defendants withheld as leverage. Plaintiffs thus "ha[d] a pre-existing entitlement to pursue [their] business interests free of the fear [they were] quelling." *Id*. at 525.

Defendants thereafter extracted interest-rate increases of 3.75% to 5.00% that Section 7.7 forbade, extension fees that Section 7.6 forbade, and releases of Plaintiffs' claims, *i.e.*, the requisite "property" "to which the [Defendants were] not entitled." *Id*. at 523–24. And Defendants induced Plaintiffs' "consent" through fear Defendants manufactured by withholding contractually owed extensions and draws. That is the extortion scenario *Brokerage Concepts* describes, not the hard bargaining it found. At a minimum, whether Defendants had a lawful claim to the property obtained, and whether the fear was wrongfully manufactured, are fact questions that cannot be resolved against Plaintiffs on the pleadings before this Honorable Court.

The FAC ties specific predicate communications to specific Defendants, *e.g.*, Schultz (August 7–8 and August 22, 2025) and Altig (July 18, 2025), with Moses, Finzer, and Howe identified as recipients and participants in the escalating denials and delays; it also alleges that Saluda Grade directed the funding decisions daily. [FAC ¶¶ 24, 271–281]. That suffices to allege each Defendant's participation in the operation or management of the enterprise's affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). To the extent the precise allocation of additional acts among Defendants depends on Defendants' internal records, Rule 9(b)'s particularity requirement is relaxed. *In re Rockefeller*, 311 F.3d at 216. Any residual concern as to a particular Defendant warrants leave to amend, not dismissal with prejudice.

### C.  *The §1962(d) Conspiracy Claim Similarly Survives*

Defendants' sole argument against Count II is that it is derivative of Count I. Because the substantive § 1962(c) claim is adequately pleaded, the conspiracy claim survives with it. Independently, the FAC alleges an agreement: the coordinated, multi-year scheme and Altig's admission of daily coordination between Loan Services and Saluda Grade permit the inference that Defendants agreed to participate in the conduct of the enterprise through a pattern of

racketeering activity. [FAC ¶¶ 24, 305–308]. This sufficiently alleges a conspiracy claim sufficient to defeat the instant Motion.

### D. The Breach of Contract Claim is Adequately Pleaded

Defendants' assertion that Plaintiffs "do not point to an actual provision" when alleging breach is contradicted by the FAC. Plaintiffs allege Loan Services breached: (i) Section 7.7, by demanding rate increases of 3.75%–5.00% where the Note guaranteed a 0.00% increase on extension; (ii) Section 7.6, by demanding a fee for the first extension where the Note guaranteed none; and (iii) Sections 5.1 and 5.3, by refusing to fund draws for completed work and on-site materials, imposing extra-contractual conditions, and delaying approved wires. [FAC ¶¶ 314–324]. Those are specific, identified contractual promises — the breach of which each states a claim for breach of contract. *McMullen v. Kutz*, 985 A.2d 769, 776–78 (Pa. 2009) (freely negotiated terms are enforced as written).

Every Pennsylvania contract carries an implied covenant of good faith and fair dealing. *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. 1992). Defendants' authorities hold only that a lender does not breach that covenant by enforcing its rights (*e.g., Seal v. Riverside Fed. Sav. Bank*, 825 F. Supp. 686 (E.D. Pa. 1993)). But Plaintiffs do not complain that Defendants enforced their rights; they allege Defendants exercised their discretionary draw-review power (§ 5.3) arbitrarily and in bad faith, by manufacturing delay through claimed wire cutoffs, postponed committees, and pretextual completion findings, to engineer defaults. [FAC ¶¶ 322–324]. The covenant constrains the discretionary exercise of contractual power, and the FAC plausibly alleges that power was abused for illicit reasons, in keeping with Defendants' predatory lending scheme.

To the extent Defendants contend Plaintiffs failed to satisfy a condition to the Section 7 extension, the prevention doctrine bars that defense: a party may not assert the non-occurrence of

23 of 24

a condition that its own wrongful conduct caused. Restatement (Second) of Contracts § 245. The FAC alleges Defendants' deliberate underfunding prevented Plaintiffs from reaching the construction milestones that would have rendered any extension condition a non-issue. [FAC ¶¶ 320–321]. That allegation, taken as true, excuses performance and defeats such defense at the pleading stage.

**VI.**
**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to dismiss in its entirety.

*Respectfully submitted,*

**SILVERANG, ROSENZWEIG**
**& HALTZMAN, LLC**

 /s/ Philip S. Rosenzweig
**By:**    Philip S. Rosenzweig, Esquire
Kevin D. McGowan, Jr., Esquire
PA Atty ID Nos. 62461 / 324196
Woodlands Center
900 E. 8th Ave., Suite 300
King of Prussia, PA 19406
(610) 263-0115
*Attorneys for Plaintiffs,*
*Midvale Commons, LLC, Trolley Car*
*Development, L.P., Indiana Heights, LLC,*
*and Plymouth Square Associates I*

4905-8177-1954, v. 3